**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JODI SILBERMAN** | ) | |
| | ) | **Civil Action No. 1:20-cv-01745** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Thomas Durkin** |
| | ) | |
| **EUGENE SCALIA,** | ) | |
| **Secretary,** | ) | **Jury Trial Demanded** |
| **U.S. Dept. of Labor** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, through her undersigned attorney, Jason Han of the Law Offices of Jason Han, states as follows as her Complaint:

### PRELIMINARY STATEMENT

1) This is a civil action by Plaintiff, Jodi Silberman, ("Ms. Silberman"), to correct unlawful employment discrimination and retaliation committed by the United States Department of Labor ("Agency"). Ms. Silberman was an accomplished Equal Opportunity Specialist ("EOS") who conducted compliance reviews and investigations of federal contractors. In 1997, she started work at the Office of Federal Contract Compliance Programs ("OFCCP") within the Agency's Chicago District Office.

2) Ms. Silberman's claims arise from the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791 *et seq.,* and that Act's application of the Americans with Disabilities Act, 42 U.S.C. §§12112, and the ADA Amendments Act of 2008, 42

U.S.C. §§12102, *et seq.,* as amended, to Federal employees who enjoy the remedies available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981a(2).

3)      Beginning in 2006, Ms. Silberman disclosed to the Agency her disabilities of anxiety and depression. She requested and received an accommodation. In 2006, Ms. Silberman's supervisor evaluated her negatively. Because of the negative evaluation, in 2007, Ms. Silberman filed an EEO discrimination complaint. In 2010, the Agency settled this charge by paying her $17,500.

4)      In 2011 and 2012, two new supervisors became Ms. Silberman's second-line and first-line supervisors, respectively. Around this time, Ms. Silberman experienced retaliation for her prior EEO activity. She filed an EEO complaint to begin the Federal sector process anew. When she gave notice to the Agency of her complaint, her second-line supervisor subjected her to two interrogations.

5)      In the second interrogation, an Agency official committed harassment when he became combative and threatening towards Ms. Silberman. Frightened and emotionally distraught by his conduct and her second-line supervisor's failure to take corrective action, Ms. Silberman contacted the Federal police. She also notified her second-line supervisor's supervisor.

6)      After Ms. Silberman informed her second-line supervisor that she complained to his supervisor, he placed her on indefinite Administrative Leave. Less than three weeks later, he filed a complaint about Ms. Silberman to the Illinois Attorney Registration and Disciplinary Commission ("ARDC"), the licensing board

over all Illinois attorneys. This necessitated Ms. Silberman to hire two attorneys to defend herself. The ARDC eventually closed its case against her without taking further action.

7)      Throughout the ordeal, Ms. Silberman could have performed the essential functions of her position with an accommodation of telework because of the sedentary nature of the job; her essential functions involved sitting at a computer, analyzing data, and writing reports. She requested the accommodation of telework on July 1, 2012.

8)      The Agency's acts of retaliation caused Ms. Silberman physical and emotional pain. While on indefinite Administrative Leave, Ms. Silberman continued to press for an accommodation. The Agency refused to engage in good faith. Ultimately, Ms. Silberman realized the Agency intended to terminate her. She resigned before it could do so. Though she desired to work, she was constructively discharged.

9)      Ms. Silberman seeks: a) reinstatement; b) compensatory damages; c) backpay; d) an adjustment to her retirement benefit reflecting its value had the Agency not constructively discharged her; and e) an award of attorneys' fees and costs.

## PARTIES, JURISDICTION, AND VENUE

10)      Plaintiff, Jodi Silberman ("Ms. Silberman"), was classified as a General Schedule ("GS") grade 11 Equal Opportunity Specialist ("EOS") with the United States Department of Labor's Office of Federal Contract Compliance Programs

3

("OFCCP") in Chicago, Illinois. At all relevant times, Ms. Silberman was a resident of Cook County, Illinois.

11)    Defendant, Eugene Scalia, is the Secretary of the Department of Labor, the Cabinet official who heads it, and is sued only in his official capacity. The Department of Labor is a department in the Executive Branch of the Federal government, the mission of which includes regulating America's labor force, employers, and enforcing Federal law such as the Rehabilitation Act and the Americans with Disabilities Act.

12)    Jurisdiction of this Court is based upon 28 U.S.C. §1332; 29 U.S.C. §794a(a)(1); and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §§2000e-5). Venue lies here under 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because the actions of the Agency were taken by the Agency's management from their duty stations in this judicial district where Ms. Silberman was employed when the actions occurred.

## STATEMENT OF FACTS

*Background*

13)    On November 5, 1992, Ms. Silberman was authorized to practice law in Illinois after graduating from Drake University Law School. Over the years she has maintained her license to practice law. Her license remains active today.

14)    On March 31, 1997, Ms. Silberman joined the Chicago District Office of the United States Department of Labor ("Agency") as an Equal Opportunity

Specialist ("EOS") within the Office of Federal Contract Compliance Programs ("OFCCP").

15)     The essential job function of an EOS involves analyzing investigative data procured from contractors and subcontractors who do business with the Federal government. An EOS writes reports regarding whether contractors are complying with Federal standards to not discriminate and take affirmative action in all areas of employment.

16)     For the first nine years of her employment, Ms. Silberman earned evaluations that demonstrated she met and exceeded the Agency's legitimate expectations.

***In 2006, Ms. Silberman Discloses Disabilities Resulting in Discrimination***

17)     In 2006, Ms. Silberman disclosed to her then-immediate supervisor disabilities of anxiety, depression, and social phobias. She requested the Agency to accommodate her disabilities.

18)     In 2006, Ms. Silberman received a negative annual evaluation from her first and second-line supervisors. They refused to change the review and informed Ms. Silberman to file an EEO complaint.

19)     On February 2, 2007, Ms. Silberman filed a complaint of discrimination. On October 29, 2010, the Agency agreed to settle the case resulting in a lump sum payment of $17,500.

20)     Despite the settlement, the Agency continued to discriminate and retaliate against Ms. Silberman. On June 22, 2011, Ms. Silberman filed another

complaint of discrimination. The case was given an Agency case number of DOL-11-05-095. When the EEOC Hearings Unit assigned the case to an administrative judge, they gave it the EEOC case number of 440-2012-00062X. That case's claims are not at the heart of the issue of this civil action.

***Ms. Silberman Experiences Retaliation for Prior EEO Activity***

21)     In 2011, Rachel Torres, the OFCCP's Director for Management and Administrative Programs in the Agency's Washington, D.C. office, recommended the Agency terminate Ms. Silberman's employment partly because of Ms. Silberman's prior EEO activity.

22)     Ms. Silberman fought against Torres' recommendation and managed to reduce it to a 25-day suspension.

23)     In July 2011, Ms. Silberman filed a Merit Systems Protection Board ("MSPB") appeal alleging the 25-day suspension was in retaliation for her prior EEO activity. The MSPB appeal resulted in a hearing wherein Joseph Kiefer, one of the Agency's labor relations managers, was cross-examined about his statement that he would have Ms. Silberman removed from the Federal service. Kiefer did not deny that he said this. Kiefer's title was Regional Labor Relations Manager. He worked within the Agency's Chicago Office of the Assistant Secretary for Administration & Management ("OASAM"). OASAM is the Agency's human resources department.

24)     The constant stress of undergoing years of Agency retaliation resulted in Ms. Silberman experiencing issues with her eyes, skin, sleep problems, fatigue,

hair loss, and a sudden loss of weight. After seeing a medical provider, she was diagnosed as suffering from hyperthyroidism, a stress related illness. She was advised hyperthyroidism exacerbates anxiety.

25)     In October 2011, Michael Thomas became the District Director of OFCCP's Chicago District office. As District Director, Thomas supervised a group of two equal opportunity assistants, two assistant district directors, and 22 equal opportunity specialists ("EOS"). Ms. Silberman was one of the 22 EOS he supervised. He became her second-line supervisor.

26)     Ms. Silberman's first-line supervisor was Donna Felder, one of the two assistant district directors under Thomas' supervision.

27)     Thomas learned of Ms. Silberman's prior EEO activity within the first month of his new role as District Director. He learned this information from Agency OASAM Manager, Joseph Kiefer, the individual who did not deny he would remove Ms. Silberman from Federal service.

28)     Kiefer warned Thomas that Ms. Silberman "likes to litigate".

### Ms. Silberman Complains of Retaliation and Discrimination

29)     On March 28, 2012, Ms. Silberman emailed the Director of the OFCCP, Patricia Shiu. As Director of the OFCCP, Shiu was several positions above Thomas and had the authority to promote, demote, or fire him. Before joining the Agency, Shiu had worked for 26 years for the Legal Aid Society-Employment Law Center in San Francisco. In that role, she had litigated numerous employment discrimination and FMLA cases on behalf of employees. She had also been a treasurer for the

Board of the National Employment Lawyers Association, a bar association of plaintiff-side employment lawyers.

30)     Ms. Silberman knew of Director Shiu's background. She also knew that as the Director of an office dedicated to enforcing EEO compliance among Federal government contractors, Shiu had a legal obligation to take prompt, remedial action regarding EEO complaints reported to her. Ms. Silberman's email complained of the Agency's retaliation against her.

31)     On March 29, 2012, Ms. Silberman received a response from Rolando Valdez, Senior Trial Attorney for OFCCP. Valdez' email warned Ms. Silberman to stop emailing Director Shiu about her discrimination and retaliation complaints.

32)     On April 2, 2012, Ms. Silberman emailed Valdez and Rachel Torres. Torres had been the Director who, in 2011, recommended Ms. Silberman's employment be terminated. Both Torres and Valdez are based in Washington, D.C. Ms. Silberman's email contained a copy of a recent order from EEOC case number 440-2012-00062X. The order mandated Ms. Silberman and the Agency discuss settlement.

33)     Thomas' office received notice from an Agency employee in D.C. that Ms. Silberman had emailed them. He decided to interrogate Ms. Silberman in an interview that could lead to disciplinary or adverse action against her.

***Thomas Subjects Ms. Silberman to the First Interrogation***

34)     On April 24, 2012, Thomas ordered Ms. Silberman to submit to what he called an "investigative interview". Appearing at this interrogation were

8

Thomas, Ms. Silberman, and Gregory Smith. Smith was one of the two assistant district directors supervised by Thomas. During the interrogation, Smith remained silent while taking notes. The other assistant district director under Thomas' supervision, Donna Felder, was Ms. Silberman's first-line supervisor. Felder did not appear.

35) To prepare for the interrogation, Thomas had sought informal training from Holly Coffey-Flynn and Joseph Kiefer. Coffey-Flynn was a Human Resources Specialist within OASAM. Kiefer was Coffey-Flynn's supervisor. Coffey-Flynn maintained a file on Ms. Silberman dating to 2007 named "All things relating to Jodi Silberman." This file violated the collective bargaining agreement between the Agency and Ms. Silberman's union.

36) The interrogation was held in Thomas' office. For two hours, Thomas cross-examined Ms. Silberman with forty questions regarding: her emails with D.C.-based Agency officials, her prior EEO activity, her current EEO case against the Agency, and her recent complaints of retaliation and discrimination.

37) Ms. Silberman said Thomas was retaliating against her for having engaged in the EEO process and for complaining of discrimination and retaliation.

38) Shortly after the interrogation, Thomas shared a copy of Smith's notes with Coffey-Flynn and Kiefer. The notes were never shared with Ms. Silberman.

***Ms. Silberman Files a Complaint and Experiences More Retaliation***

39) On May 1, 2012, Ms. Silberman filed an informal complaint of harassment and retaliation based on the April 24 interrogation. An informal

complaint is a preliminary step in the Federal Sector EEO process. If the informal complaint remains unresolved, an employee can file a formal complaint. Ms. Silberman made her complaint formal on May 22, 2012. The Agency assigned an investigator as required by the Federal Sector EEO process. At the end of the investigation, on May 9, 2013, the investigator submitted a Report of Investigation ("ROI") of 860 pages. The ROI included a notice of right to Request a Hearing before an administrative judge. This became EEOC case number 440-2014-00077X which eventually lead to this civil action.

40)     After Ms. Silberman filed the May 1, 2012 informal complaint, OASAM conducted a limited fact-finding investigation by emailing Rolando Valdez. The email disclosed Ms. Silberman's informal complaint.

41)     On May 25, 2012, Donna Felder, Ms. Silberman's first-line supervisor, gave Ms. Silberman her mid-year review. Felder rated Ms. Silberman as a "meets" Agency expectations, including in the category of "effectively communicates with others both orally and in writing."

42)     The evaluation was one of Felder's last supervisory acts over Ms. Silberman. At the end of May, the Agency replaced her with Shelley Gordon.

43)     On June 1, 2012, Ms. Silberman sought medical treatment for her eyes. Her medical provider discovered that her hyperthyroidism had elevated the pressure in them to dangerous levels. She was diagnosed with glaucoma and thyroid eye disease. Her medical provider told her she could lose her eyesight.

44)    On June 6, 2012, Ms. Silberman emailed Director of the OFCCP, Patricia Shiu. Ms. Silberman wrote that the stress from the harassment and retaliation she had been subjected to had caused her health problems. Her email also implied she needed an accommodation.

45)    Betty Lopez, an EEO Manager within OASAM, responded to Ms. Silberman and cc'ed Valdez. The email contained boilerplate instructions and links on submitting workers' compensation/disability claims and EEO complaints.

46)    A few hours after Betty Lopez' email, Ms. Silberman's new first-line supervisor, Shelley Gordon, emailed Ms. Silberman cc'ing Thomas. Gordon's email referenced workers compensation/disability claims. Her email also provided Ms. Silberman boilerplate instructions on filing claims for both. The email did not mention Ms. Silberman's complaints of discrimination and retaliation, nor did it mention Ms. Silberman's need for accommodation.

47)    Shortly after Ms. Silberman's email to Shiu, Thomas scheduled a meeting for June 13, 2012 with OASAM officials. At the meeting, Thomas and Gordon consulted with OASAM employees Jim Ballou, Joseph Kiefer, and Holly Coffey-Flynn. The attendees agreed to subject Ms. Silberman to a second "investigative interview".

48)    Around 10am on June 26, 2012, Ms. Silberman was working at her desk when she was ambushed with notice of a second interrogation. Ms. Silberman reacted by going to Thomas' office. She said the interrogations were harassing and

retaliatory. Feeling ill, she asked to take sick leave so she could go home. That request was denied. She was told to remain at work until the interrogation.

49)     In the afternoon, Ms. Silberman was directed to a conference room. In the room were Thomas, Kiefer, Gordon, Smith, union representative Terry Pierson, and Ms. Silberman. Though Pierson's ostensible purpose was to represent Ms. Silberman, they had no prior relationship nor were Ms. Silberman and Pierson given time to prepare for the interrogation beforehand. Pierson stayed mostly silent.

50)     Much like in the first interrogation, Smith remained silent while taking notes. Gordon remained mostly silent as well.

51)     The meeting began with intimidation. When Ms. Silberman entered the room, she attempted to sit down in the chair closest to the door. Kiefer physically blocked her by placing his hand on that chair and ordered her to sit in the chair directly opposite to where he sat. Ms. Silberman is a small woman. Kiefer towered over her. Smith, a 6'3" man, sat with his back to the door blocking Ms. Silberman's exit.

52)     Thomas presented Ms. Silberman with her emails to Shiu and repeatedly questioned why she had sent them. Ms. Silberman became visibly distressed. From the beginning to the end of Thomas' interrogation, she said she was ill at least five times and pleaded for accommodations.

53)     Kiefer became irate. Though Ms. Silberman admitted she sent the emails to Shiu, he appeared to be unsatisfied with her answers. He screamed and yelled. He leaned his body forward until his reddened face was only inches away

12

from Ms. Silberman. Kiefer's intimidation tactics shook her. She felt threatened. Gordon observed Thomas gesturing at Kiefer to calm down. Later, Thomas admitted he thought to himself, "Joe, you need to cool it."

54)    The interrogation ended over two hours later. Once it ended, Thomas and Gordon allowed Ms. Silberman to use sick leave to take the rest of the day off.

55)    The next day, Ms. Silberman contacted the Federal Protective Service ("FPS"), the agency tasked with policing Federal buildings. She filed a report with them that she had been unlawfully restrained during the second interrogation. FPS officers then questioned Thomas in his office.

56)    On June 28, 2012, Ms. Silberman emailed a letter to Thomas' supervisor, Bradley Anderson, the Chicago-based Regional Director of the Midwest Region. She wrote of what had occurred on June 26. She ended the letter requesting an immediate end to the harassment and retaliation. Instead of responding, Anderson welcomed Thomas into his office on the morning of June 29, 2012. Anderson listened to Thomas' side of the story. He did not ask Ms. Silberman for her side of the story. He never replied to her letter. He did not follow the Agency's anti-harassment policy and guidelines. He never took corrective action.

***The Agency Retaliates and Thomas Complains to the ARDC***

57)    In the afternoon of June 29, 2012, Thomas approached Ms. Silberman to place her on indefinite Administrative Leave.  Before Ms. Silberman left the office, Thomas instructed her to only speak to either him or Gordon.

58)     After placing Ms. Silberman on indefinite Administrative Leave, Thomas consulted with Coffey-Flynn on whether they could remove her. They drafted a proposed removal including allegations related to Ms. Silberman's complaint to the FPS and her emails to Shiu.

59)     Thomas later admitted he did not know if Ms. Silberman's contact with Shiu violated Agency policies.

60)     On July 16, 2012, Thomas wrote a letter to complain about Ms. Silberman with the Illinois Attorney Registration Disciplinary Commission ("ARDC"). The ARDC regulates all Illinois attorneys. It has the power to revoke an attorney's license to practice law based on a violation of the Illinois Rules of Professional Conduct. In this letter, Thomas claimed that Ms. Silberman violated Rule of Professional Conduct 4.2 when he contacted Director Shiu. Rule 4.2 prohibits communication with persons represented by counsel. He also claimed Ms. Silberman violated Rule of Professional Conduct 8.4(c). Rule 8.4 defines instances of lawyer misconduct including (c): engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Thomas claimed when Ms. Silberman contacted Federal Protective Service, she engaged in dishonest and deceitful conduct.

61)     The ARDC subsequently investigated Ms. Silberman. She hired two attorneys to defend herself from Thomas' allegations. The ARDC ultimately closed the case without taking further action against her.

***The Agency Grants Accommodations-In-Name Only and Retaliates Again***

62)   On September 13, 2012, Thomas sent Ms. Silberman notice of his intent to conduct a third interrogation. This notice said the "investigative interview" was scheduled for September 28, 2012. Ms. Silberman was still on indefinite Administrative Leave.

63)   Thomas communicated to Washington D.C.-based Agency officials his intent to interrogate Ms. Silberman a third time. In an email thread from around September 18, 2012, the D.C. officials advised against a third interrogation. Thomas disagreed and demanded Ms. Silberman submit one more time.

64)   During the week of October 22, 2012, while Ms. Silberman was still on indefinite Administrative Leave, the Agency issued its annual evaluation of her. Felder was no longer her first-line supervisor and so Gordon authored the evaluation. Gordon rated Ms. Silberman as a "partially meets" on the evaluation, a lower rating than the mid-year rating Felder had given her. This rating constituted a negative evaluation.

65)   On October 24, 2012, Thomas sent Ms. Silberman a list of 100 questions to answer. He asked her to respond to the questions within 10 days and instructed her to notarize her answers.

66)   On November 1, 2012, Gordon spoke via phone with Ms. Silberman for the stated purpose of undergoing the interactive process based on Ms. Silberman's July 1, 2012 accommodation request. Ms. Silberman was still on indefinite Administrative Leave.

15

67)     Under the regulations of the Rehabilitation Act, the purpose of an interactive process is to determine an appropriate accommodation suitable for both employer and the disabled employee. During Ms. Silberman's interactive process with Gordon, she again asked for telework. Ms. Silberman also requested an accommodation reassignment to a different position within the Agency, away from the supervision of Thomas.

68)     On November 20, 2012, Gordon notified Ms. Silberman that her July 1, 2012 accommodation request had been granted. The notice did not indicate Ms. Silberman was no longer on indefinite Administrative Leave. The notice did not grant her permission to return to work.

69)     In February 2013, while still on indefinite Administrative Leave, Ms. Silberman learned the Agency planned to terminate her on February 22. On February 22, 2013 at 9am, Ms. Silberman resigned.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

70)     On May 22, 2012, Ms. Silberman timely initiated the agency's EEO complaint process and filed her first formal complaint (DOL-12-05-085). She amended this complaint as required to add additional claims of discrimination and reprisal, including Thomas' letter to the ARDC, that are at issue. Her claims were accepted and investigated by the Agency.

71)     On July 15, 2013, Ms. Silberman filed a second formal complaint (DOL 13-05-111). This second complaint alleged the Agency failed to accommodate her when: 1) the Agency granted her accommodation request on November 20, 2012,

16

and then failed to implement it; and 2) the Agency did not grant her request for reassignment within the Agency. Her claims were accepted and investigated by the Agency.

72)     On January 23, 2014, Ms. Silberman timely filed a Request for Hearing with the EEOC on her first formal complaint (DOL-12-05-085). The EEOC assigned the case to Administrative Judge June Wallace Calhoun and gave it the case number 440-2014-00077X.

73)     Three days after Ms. Silberman filed her Request for Hearing for the first complaint, on January 27, 2014, the investigation of Ms. Silberman's second complaint (DOL 13-05-111) ended with a completed Report of Investigation ("ROI"). Though the Agency was required to consolidate this complaint with the first complaint (DOL-12-05-085), it failed to do so. Only the first complaint was sent to hearing.

74)     In April 2014, Ms. Silberman submitted a Request for Hearing on the second complaint (DOL 13-05-111). Because 30 days had passed since the issuance of that complaint's ROI, the Agency told Ms. Silberman they could only issue a Final Agency Decision ("FAD") on the second complaint.

75)     After the FAD was issued on the second complaint (DOL 13-05-111), Ms. Silberman appealed it to the Office of Federal Operations ("OFO"). She argued the Agency erred when it issued the FAD instead of consolidating the two complaints together to be sent to the EEOC for hearing.

17

76)     On February 1, 2017, the OFO found "that these cases are connected, i.e. the accommodation the Complainant was seeking was due to the alleged hostile work environment that she maintains led to her resignation." The OFO ordered the Agency to rescind the FAD and remand case DOL 13-05-111 (second complaint) to the EEOC Hearing Unit of the Chicago District Office to be consolidated with DOL-12-05-085 (first complaint).

77)     The Agency never informed the EEOC Hearing Unit of the Chicago District Office of the OFO's March 1, 2017 Order. As a result, the EEOC failed to consolidate the two complaints.

78)     On October 17, 2017, Administrative Judge Calhoun issued a decision granting the Agency's Motion for Summary Judgment in the first case (DOL 12-05-085/EEOC No. 440-2014-00077X). The decision did not mention the second complaint.

79)     On October 24, 2017, Ms. Silberman filed a Motion to Vacate, Reinstate, Consolidate, and Set a Hearing Date. As part of this Motion, Ms. Silberman asked to vacate the decision to grant the Agency's motion for summary judgment. Ms. Silberman also copied the OFO's February 1, 2017 ruling requiring the EEOC Hearing Unit to consolidate the two complaints.

80)     On November 2, 2017, the Agency filed its Opposition to Ms. Silberman's Motion. In its Opposition, the Agency failed to admit it did not comply with the OFO's February 1, 2017 Order. Administrative Judge Calhoun denied Ms. Silberman's Motion. She observed that the EEOC Hearings Unit had assigned the

second complaint (DOL 13-05-111) to her with the EEOC case number 440-2018-00020X. She found failing to consolidate the two complaints did not prejudice her in regard to adjudicating the second complaint.

81)    The Agency filed a Motion to Dismiss in the second case (DOL 13-05-111/EEOC No. 440-2018-00020X) under the argument Ms. Silberman's claims were moot. On February 27, 2018, Administrative Judge Calhoun issued a ruling granting the Agency's Motion to Dismiss.

82)    The Agency's FADs of both cases implemented Administrative Judge Calhoun's orders.

83)    Ms. Silberman timely appealed the Agency's FADs to the OFO. On June 5, 2019, the OFO issued a decision on the two appeals. The decision also affirmed the Administrative Judge's Summary Judgment Decision in the first case (440-2014-00077X) and her ruling granting the Agency's Motion to Dismiss in the second case (440-2018-00020X).

84)    Ms. Silberman timely filed a request for reconsideration to the OFO. On December 18, 2019, the OFO issued a decision on her request for reconsideration. The decision affirmed the OFO's previous decision and stated the two cases were consolidated. It also gave Ms. Silberman notice of her right to file a civil action in a United States District Court within 90 days from the date she received the decision.

85)    Ms. Silberman exhausted her administrative remedies. On March 12, 2020, she initiated this civil action within 90 days of receipt of the OFO's final decision.

## COUNT I
### (Retaliation Leading to ARDC Complaint)

86)    Ms. Silberman restates the allegations of ¶¶1 through 85 as though stated herein.

87)    At all relevant times, Ms. Silberman was an individual with a disability having a record of physical and mental impairments. The Agency regarded her as having physical and mental impairments. She suffered from anxiety, depression, phobias, hyperthyroidism, thyroid eye disease, and glaucoma.

88)    Ms. Silberman's disabilities substantially limited one or more major life activities including her ability to drive, sleep, and eat. Ms. Silberman required therapy, medical treatment, and medication as treatment for her disabilities.

89)    Ms. Silberman was a qualified individual with a disability because with or without reasonable accommodation, she performed the essential functions of her position within the Agency.

90)    From 2006 to 2012, Ms. Silberman engaged in protected activities such as requesting accommodations, complaining of discrimination and reprisal, and other acts opposing discrimination.

91)    The Agency, through Ms. Silberman's second-line supervisor, Michael Thomas, retaliated against her by filing a complaint to the ARDC claiming she had violated the Illinois Rules of Professional Conduct.

92)   Thomas' adverse employment action violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 *et seq.*

93)   The Agency's retaliation caused Ms. Silberman to hire attorneys to defend her during the ARDC's investigation. Though the ARDC eventually closed Thomas' complaint against her, the incident injured her career and reputation, caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT II
### (Supervisor Harassment)

94)   Ms. Silberman restates the allegations of ¶¶1 through 93 as though stated herein.

95)   Ms. Silberman's second-line supervisor, Michael Thomas, subjected Ms. Silberman to interrogations on April 24, 2012 and June 26, 2012. Both interrogations involved harassing conduct against her. In the June 26 interrogation, Joseph Kiefer intimidated Ms. Silberman when he blocked her from sitting in the chair nearest the exit and ordered her to sit across from him. He also screamed and yelled at Ms. Silberman while leaning forward towards her as Thomas, Gordon, and Smith watched and said nothing.

96)   Ms. Silberman continued to be harassed even after she was placed on indefinite Administrative Leave because Thomas demanded she come in for a third investigative interview and sent her a list of 100 questions  with instruction that she notarize her answers.

97)    The harassment continued into February 2013 when Ms. Silberman learned she would be terminated on February 22, 2013.

98)    The harassment was unwelcome.

99)    The harassment occurred because of Ms. Silberman's disabilities and protected activities.

100)    The harassment was sufficiently severe or pervasive that a reasonable person in Ms. Silberman's position would find the work environment to be hostile.

101)    When the conduct occurred, Ms. Silberman believed the harassment made her work environment hostile or abusive.

102)    The harassment caused the constructive discharge of Ms. Silberman.

103)    The Agency failed to exercise reasonable care to prevent and correct any harassing conduct in the workplace.

104)    The harassment resulted in injury to Ms. Silberman's career and professional reputation; negatively affected her retirement annuity and annual leave payout upon retirement; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT III
### (Harassment by Co-Employee or Third Party)

105)    Ms. Silberman restates the allegations of ¶¶1 through 104 as though stated herein.

106)    The Agency, through Michael Thomas, subjected Ms. Silberman to an interrogation on June 26, 2012. In that interrogation, Joseph Kiefer intimidated Ms.

Silberman. He blocked her from sitting in the chair nearest the door and then ordered her to sit across from him. While leaning forwards toward her, he screamed and yelled. Thomas observed Kiefer's harassment yet failed to take corrective action.

107) The June 26, 2012 interrogation was not the first time Kiefer had disclosed his intent to remove Ms. Silberman from Federal service. He had previously acknowledged his intent during a 2011 MSPB hearing.

108) The harassment was unwelcome.

109) The harassment occurred because of Ms. Silberman's disabilities and protected activities.

110) The harassment was sufficiently severe or pervasive that a reasonable person in Ms. Silberman's position would find the work environment to be hostile.

111) When the conduct occurred, Ms. Silberman believed the harassment made her work environment hostile or abusive.

112) The Agency knew or should have known about the conduct.

113) The Agency failed to take reasonable steps to correct the situation or prevent Kiefer's harassment against Ms. Silberman from recurring.

114) Kiefer's harassment resulted in injury to Ms. Silberman's career and professional reputation; negatively affected her retirement annuity and annual leave payout upon retirement; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

23

## COUNT IV
### (Retaliation Leading to Administrative Leave)

115)    Ms. Silberman restates the allegations of ¶¶1 through 114 as though stated herein.

116)    From 2006 to 2012, Ms. Silberman engaged in protected activities such as requesting accommodations, complaining of discrimination and reprisal, and other acts opposing discrimination.

117)    The Agency, through Ms. Silberman's second-line supervisor, Michael Thomas, retaliated against her by placing Ms. Silberman on indefinite Administrative Leave.

118)    Thomas' adverse employment action violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 *et. seq.*

119)    The Agency's retaliatory action resulted in injury to Ms. Silberman's career and professional reputation; negatively affected her retirement annuity and annual leave payout upon retirement; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT V
### (Retaliation Leading to Negative Evaluation)

120)    Ms. Silberman restates the allegations of ¶¶1 through 119 as though stated herein.

121) In the week of October 22, 2012, Ms. Silberman's first-line supervisor, Shelley Gordon, rated Ms. Silberman a "Partially Meets" on her annual performance evaluation.

122) This rating was lower than Ms. Silberman's immediate past ratings, including the last evaluation authored by her previous first-line supervisor, Donna Felder. This lowered rating constituted a negative evaluation.

123) The Agency issued a negative evaluation of Ms. Silberman because of her protected EEO activities.

124) The Agency's negative evaluation violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 *et. seq.*

125) The Agency's retaliatory action resulted in injury to Ms. Silberman's career and professional reputation; negatively affected her retirement annuity and annual leave payout upon retirement; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## COUNT VI
## (Failure to Accommodate)

126) Ms. Silberman restates the allegations of ¶¶1 through 125 as though stated herein.

127) In March to June of 2012, Ms. Silberman sent emails to Agency officials disclosing her disabilities. Those emails implied she needed an accommodation.

128)    Under the Rehabilitation Act, the Agency had a duty to inform Ms. Silberman her right to request accommodation upon reasonable notice of disability and the need for accommodation.

129)    Ms. Silberman made her reasonable accommodation request explicit on July 1, 2012. In an email, she wrote a request for the accommodation of telework.

130)    On November 1, 2012, Ms. Silberman's first-line supervisor, Shelly Gordon, spoke with her by phone to ostensibly begin the interactive process to determine a proper accommodation. During the interactive process, Ms. Silberman also requested reassignment to a different position within the Agency, away from the supervision of Thomas.

131)    On November 20, 2012, Gordon responded to Ms. Silberman's July 1 request. She granted the accommodation of telework. However, Gordon did not address Ms. Silberman's request for reassignment.

132)    Despite the Agency's failure to address Ms. Silberman's request for reassignment, she intended to begin telework once her indefinite Administrative Leave ended.

133)    Ms. Silberman waited for the Agency to implement the telework accommodation until February 2013 when she learned the Agency intended to terminate her employment on February 22, 2013.

134)    Ms. Silberman resigned before the Agency could terminate her employment by submitting her resignation on February 21, 2013 at 9am.

135)   The Agency failed to accommodate Ms. Silberman's telework request. The Agency also failed to accommodate Ms. Silberman when she requested reassignment to a different position.

136)   The Agency's failure to accommodate Ms. Silberman's disabilities resulted in injury to Ms. Silberman's career and professional reputation; negatively affected her retirement annuity and annual leave payout upon retirement; and caused her to suffer physical and emotional pain, embarrassment, humiliation, mental anguish, inconvenience, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Jodi Silberman, prays this Court enter a judgment:

A. Declaring Defendants' actions and practices violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791, *et seq.*

B. Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of professional reputation, loss of enjoyment of life, and detrimental impact on her health caused by Defendant's unlawful actions.

C. Directing Defendants to make Plaintiff whole by providing her back pay, front pay, and reimbursement for all lost benefits;

D. Directing Defendants to make retroactive adjustment of her retirement annuity and annual leave to the level at which it would have been had Defendant not constructively discharged her.

E. Attorney's fees and costs incurred by Plaintiff; and

F. Such other relief as may be just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

/s/ Jason Han
Counsel for Plaintiff

Jason Han
The Law Offices of Jason Han
73 W Monroe St. Ste. 100
Chicago, IL 60603
Tel. (872) 201-0088
Jason@JasonHanLaw.com