IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JODI SILBERMAN,

        Plaintiff,

    v.

LORI CHAVEZ-DEREMER,[1]
Secretary of the United States
Department of Labor,

        Defendant.

No. 20-cv-1745
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jodi Silberman (Silberman) worked as an Equal Opportunity Specialist (EOS) for the U.S. Department of Labor's Office of Contract Compliance Programs (OFCCP) until she resigned in 2013. Silberman, now proceeding *pro se*,[2] sued the Department of Labor (DOL) under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, for failure to accommodate, retaliation, and retaliatory hostile work

---

[1] Silberman's Amended Complaint was filed against Eugene Scalia, the Secretary of Labor at the time. R. 24, Am. Compl. The parties' briefs name the Defendant to be Martin J. Walsh, the Secretary of Labor when the briefs were filed. *See* R. 64, Memo. Summ. J.; R. 77, Resp. Lori Chavez-DeRemer is the current Secretary of Labor, and therefore under Federal Rule of Civil Procedure 25(d), Chavez-DeRemer is automatically substituted as a party in place of Scalia and Walsh.

[2] Silberman's Amended Complaint was filed through counsel. Am. Compl. While her summary judgment materials were filed on the docket by counsel, they are signed by Silberman herself, not by her counsel. *See, e.g.*, Resp.; R. 74, Pl. Resp. DSOF. Silberman's counsel moved to withdraw after briefing on the DOL's summary judgment motion was completed, R. 94, which the previously assigned judge granted, R. 95. Accordingly, the Court understands Silberman to be representing herself *pro se* for purposes of the DOL's summary judgment motion. If the Court is incorrect, such an understanding does not prejudice Silberman, as, if anything, that understanding means the Court will give her greater latitude than it would a represented party. Finally, the Court notes that the undisputed evidence is that Silberman is an attorney. Pl. Resp. DSOF ¶ 4.

environment. R. 24, Am. Compl.[3] Before the Court is the DOL's motion for summary judgement pursuant to Federal Rule of Civil Procedure 56. R. 63, Mot. Summ. J. For the reasons stated below, the Court grants the DOL's motion for summary judgment.

## I.      Compliance with Local Rule 56.1

Before addressing the merits of the DOL's motion, the Court must address the DOL's arguments related to Silberman's alleged non-compliance with Northern District of Illinois Local Rule 56.1 (LR 56.1). R. 82, Reply at 1–7.

"In the Northern District of Illinois, Local Rule 56.1 controls the presentation of evidence at the summary judgment stage." *Flint v. City of Belvidere*, 791 F.3d 764, 766–67 (7th Cir. 2015). Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The LR 56.1 requirements apply to *pro se* litigants. *See Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[T]he Supreme Court has made clear that even *pro se* litigants must follow rules of civil procedure.") (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)); *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994) ("[P]ro se litigants are not entitled to general dispensation from the rules of procedure or court imposed deadlines."); *Harris v. Coppes*, 2019 WL 2435847, at *1 (N.D. Ill. 2019) ("[Plaintiff's] *pro se* status does not excuse him from complying with Local Rule 56.1.") (collecting cases). "*Pro se* litigants get some latitude, but it only goes so far. There are not two sets of rules: one for *pro se* litigants, and another

---

[3]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

2

for everyone else. Everyone plays by the same Rules." *Patel v. Brennan*, 2021 WL 5937769, at *2 (N.D. Ill. Dec. 16, 2021).

The DOL posits that Silberman has failed to comply with LR 56.1 in three ways: (1) Silberman's response brief violates LR 56.1(g) by citing directly to evidence instead of specific paragraphs in the LR 56.1 statements and responses; (2) Silberman's responses to the DOL's statement of facts are improper; and (3) Silberman's statements of additional facts are not supported by admissible evidence. Reply at 1–7. The Court addresses each argument in turn.

## A. Response Brief

First, the DOL asserts that Silberman's response brief violates Local Rule 56.1(g) by: (1) citing to facts that are not contained in her LR 56.1 responses or statement of additional facts, (2) citing to exhibits not cited in her statement of additional facts, and (3) including factual assertions that are unsupported by any evidence or citation at all. Reply at 3–4.

LR 56.1 "requires the party moving for summary judgment to file and serve a 'statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) (quoting LR 56.1(a)(3)). The party opposing the motion for summary judgment is then required to file and serve "(1) a reply memorandum of law that complies with LR 56.1(g)[.]" LR 56.1(b). Relevant here, LR 56.1(g) requires each party's memorandum of law to "cite directly to specific paragraphs in the [LR] 56.1 statements or responses." LR 56.1(g).

3

Compliance with LR 56.1 "ensures the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination." *Curtis*, 807 F.3d at 219. District courts are entitled to strictly, but reasonably, enforce local rules. *See Igasaki v. Illinois Dept. of Fin. and Prof. Reg.*, 988 F.3d 948, 957 (7th Cir. 2021); *Kreg Therapeutics*, 919 F.3d at 414 (the Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1.").

Where Silberman cites to facts and exhibits not included in her response to the DOL's statement of facts and/or in her statement of additional facts, the Court agrees with the DOL that such a practice technically violates LR 56.1(g); however, where the brief cites to facts that are supported by admissible evidence attached to Silberman's statement of additional facts, the Court can reasonably understand what facts and evidence Silberman relies on. Accordingly, the Court will consider Silberman's arguments even where they do not strictly adhere to LR 56.1. On the other hand, however, where Silberman's arguments do not cite to the LR 56.1 statements or to any evidence, the Court will not consider them. *See Peak v. Laborers Union Loc. No. 1*, 2024 WL 216698, at *2 (N.D. Ill. Jan. 19, 2024); Reply at 4 (citing Resp. at 5 (stating that Silberman experienced issues with medication); *id.* at 12 (describing things Silberman did after the June 26, 2012 interview), *id.* at 16 (describing statements Silberman allegedly made to Thomas on June 29, 2012); *id.* at 25–27 (citing allegations in the Amended Complaint)).

## B. Responses to DOL's Statement of Facts

Second, the DOL contends that Silberman's responses to the DOL's statement of facts fail to properly dispute the DOL's facts, and/or impermissibly include new facts, conclusory assertions, and legal arguments. Reply at 4–5. Additionally, asserts the DOL, Silberman responds to certain facts by stating that she "lacks knowledge or information," which is not a proper denial. *Id.* at 6. Accordingly, DOL argues that these facts should be deemed admitted. *Id.* at 5–6.

When a party moves for summary judgment, it must submit three things: (1) a memorandum of law, (2) a short statement of undisputed material facts (LR 56.1 Statement), and (3) copies of materials that demonstrate the existence of those facts. *ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing LR 56.1(a)). The LR 56.1 Statement must cite to specific pages or paragraphs of materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 818 (7th Cir. 2004)).

The opposing party must file a response to the LR 56.1 Statement, either admitting or disputing each fact. LR 56.1(e)(2). If the party chooses to dispute the fact, it must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the fact." LR 56.1(e)(3). If a party fails to cite specific evidence in its dispute, the fact "may be deemed admitted." *Id.*; *see also Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's

statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.").

As the DOL points out in reply, many of Silberman's denials do not comply with LR 56.1. Where Silberman does not cite to evidence that contradicts the DOL's asserted facts—including where she merely states that she "lacks knowledge or information—the Court finds those facts to be admitted. *See Cracco*, 559 F.3d at 632; *see also Campbell v. City of Chicago*, 2018 WL 4637377, at *1 (N.D. Ill. Sept. 27, 2018) ("Purely argumentative denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 statements."); *Ativie v. NorthShore Univ. Healthsystem*, 2017 WL 714113, at *2 (N.D. Ill. Feb. 23, 2017) (deeming admitted facts to which the plaintiff responded that she "lack[ed] sufficient knowledge e to admit or deny such facts"). Accordingly, the Court deems admitted the following paragraphs in the DOL's statement of facts: ¶¶ 3, 10, 11, 12, 24, 30, 32, 33, 35, 38, 40, 41, 42, 43, 44, 46, 49, 50, 51, 54, 61, 62, 66, 67, 69, 70, 71, 74, 75, 78, 79, 83, 85, 90, 98.[4]

---

[4]The DOL also asks the Court to deem admitted paragraphs ¶¶ 59, 64. The Court does so in part, but declines to do so in part. Silberman appropriately disputes part of paragraph 59, in that she presents evidence that prior to June 1, 2012, Silberman had discussed problems related to her thyroid with Felder. *See* Pl. Resp. DSOF ¶ 59 (citing Pl. Exh. 1 at 4). Silberman does not dispute, however, the portion of paragraph 59 that she did not make any accommodation requests prior to June 6, 2012, so the Court deems that fact admitted. *See id.* Additionally, Silberman appropriately disputes the portion of paragraph 64 that states that Silberman did not contact Gordon for any assistance with "workers compensation, leave, accommodations, among other things," by citing to evidence that she contacted Gordon about Family and Medical leave on June 27, 2025. Pl. Resp. DSOF ¶ 64 (citing Def. Exh. 47 at Page ID 1756). The other portions of the paragraph are deemed admitted, however.

Moreover, to the extent Silberman included new facts, or non-responsive information, in response to a statement of material fact, the Court will not consider that information, which is tantamount of "set[ting] forth . . . facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." N.D. Ill. Local R. 56.1(e)(2); *see also Patel v. Dejoy*, 2022 WL 4776366, at *3 (N.D. Ill. Oct. 3, 2022).

### C. Silberman's Evidence

Last, DOL contends that much of Silberman's own statement of additional facts is not supported by admissible evidence as required by LR 56(c)(2). Reply at 6. Specifically, Silberman, from DOL's perspective, attempts to base certain statements of additional fact "on speculation, hearsay, opinion without foundation, and unwarranted inferences." *Id.* To be considered on summary judgment, "evidence must be admissible at trial, though the form produced at summary judgment need not be admissible. If the evidence is inadmissible hearsay, the courts may not consider it." *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (cleaned up).[5] If necessary, the Court will address the admissibility of certain evidence in the analysis below.

The Court now turns to the material facts.

### II.    Material Facts

The following facts are set forth as favorably to Silberman, the non-movant, as the record and LR 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir.

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Silberman's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed.

## A. Relevant DOL Personnel

Silberman was hired in March 1997 as an EOS in the Chicago District Office of the DOL's OFCCP; she held this same position until her resignation in February 2013. DSOF ¶¶ 1, 3.[6] Silberman has been an Illinois-licensed attorney since 1992, but she has never professionally practiced law. *Id*. ¶ 4.

Silberman's direct supervisor was an Assistant District Director, of which there were three in OFCCP's Chicago District Office. DSOF ¶ 5. Donna Felder was her direct supervisor until May 2012, when Shelley Gordon took over that role. *Id*. The Assistant District Directors were directly supervised by the District Director, who at all relevant times was Michael Thomas. *Id*. ¶ 6. Thomas was Silberman's second-level supervisor. *Id*. Thomas reported to the former Deputy Regional Director for the Midwest Region, Rafael Ortiz, and Ortiz reported to the former Regional

---

[6]Citations to the parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "DSOF" for the DOL's Statement of Undisputed Facts (R. 65); "Pl. Resp. DSOF" for Silberman's Response to the DOL's Statement of Undisputed Facts (R. 74); "PSOAF" for Silberman's Statement of Additional Facts (R. 76); and "Def. Resp. PSOAF" for the DOL's Response to Silberman's Statement of Additional Facts (R. 83).

Director for the Midwest Region, Bradley Anderson. *Id*. ¶¶ 7–8. At the OFCCP national level, there was a Director, who at all relevant times was Patricia Shiu. *Id*. ¶ 9. Finally, Joseph Kiefer was a regional Labor Relations Officer who was an employee not of OFCCP but of a different DOL sub-agency called the Office of the Assistant Secretary for Administration & Management (OASAM). *Id*. ¶ 10. Kiefer's job was to assist agency managers on personnel matters and provide advice regarding labor relations issues with the union. *Id*.

### B. Silberman's Administrative History

Before 2011, Silberman initiated and litigated various administrative matters with the agency, beginning with a complaint that alleged (1) discrimination on the basis of her religion, national origin, race, or color on account of her FY 2006 and FY 2007 performance appraisals, and (2) discrimination on the basis of her religion, national origin, race or color or retaliation for prior EEO activity after DOL management contacted the Federal Protective Service after she caused a disturbance in the workplace in March 2007. DSOF ¶ 13. Silberman filed another EEO complaint in 2011, alleging retaliation for prior EEO activity, race, religion, sex, color, age, and national origin discrimination on account of a proposed removal she received that year. *Id*. ¶ 14. Important here, none of Silberman's pre-2012 administrative matters alleged disability discrimination or retaliation on account of accommodation requests she had made in prior years. *Id*. ¶¶ 15, 56.

Beginning in January 2010, Silberman began contacting Director Shiu about resolving her then-ongoing administrative matters against the DOL. DSOF ¶ 16.

9

Silberman was repeatedly instructed not to contact Director Shiu about her litigation matters. *Id*. ¶¶ 17–18. On July 27, 2011, Silberman was given a direct order by interim deputy regional director for the Midwest region, Marvin Jordan, to stop sending messages to or copying Director Shiu and instead to contact a designated management individual. *Id*. ¶ 19. She was warned that she could incur disciplinary action if she continued to engage in this practice. *Id*. Undeterred, Silberman continued to contact Director Shiu about her litigation on no fewer than 20 occasions. *Id*. ¶ 20. Once, after contacting Director Shiu twice on March 28, 2012, Acting Counsel for Employment Law Rolando Valdez emailed Silberman on March 29 stating in part, "Over the past year or so, I have seen many email messages from you to OFCCP Director Patricia Shiu and various other DOL personnel demanding information, expressing insults, or attempting to engage in settlement discussions. Director Shiu has consistently responded to your e-mail messages by advising you to direct your issues to the appropriate DOL personnel and to communicate with Agency Counsel about litigation and settlement discussions. Despite the fact that she has informed you to deal with Agency Counsel, it seems that you continue to send her messages often comparing her to Penn State University personnel." *Id*. ¶ 21.

As an attorney, Silberman acknowledged that she was bound by the ethical rules of the profession and that there was a rule of professional conduct against communicating directly with parties known to be represented by counsel about the subject of the representation. DSOF ¶ 22. Yet, on April 18, 2012, and then on April

23, 2012, Silberman again emailed Director Shiu about her pending administrative matter. *Id*. ¶ 23.

### III. April 24, 2012 Investigative Interview and Subsequent Events

Thomas decided to conduct an investigatory interview with Silberman concerning her conduct issues, where he would ask Silberman about her emails to Director Shiu. DSOF ¶ 24. The interview took place on April 24, 2012, and Silberman, a union representative, Thomas, and Assistant District Director Gregory Smith were all present. *Id*. ¶ 25. Although Silberman answered "I don't recall" to many of the questions asked, she acknowledged that Director Shiu had advised her to direct her issues to the appropriate DOL personnel and communicate with DOL counsel about her litigation and settlement discussions. *Id*. ¶¶ 26, 33. She also admitted contacting Director Shiu "multiple times on multiple occasions." *Id*. ¶ 26. At the end of the interview, Thomas repeated Director Shiu's directive: he told Silberman not to contact Director Shiu regarding her EEO complaints and litigation, and instead instructed her to contact a DOL attorney. *Id*. ¶ 27.

On May 1, Silberman submitted an informal complaint of discrimination, alleging that on March 29 and April 24, 2012, she was subjected to a hostile work environment and retaliation based on her prior EEO activity. DSOF ¶ 28. On May 22, she filed a formal complaint of discrimination, again alleging harassment and retaliation on account of prior EEO activity. *Id*. ¶ 29. Around this time, Thomas learned of allegations that Silberman had made racial epithets ("n***er b*tch") regarding other members of OFCCP, including an employee with the national office.

11

*Id.* ¶ 30. When asked during her deposition in this case if she had ever used the term "n***er," Silberman replied that she probably has, although she denied using the term to refer to her coworkers or anyone at the DOL. *Id.*

On June 6, 2012, Silberman once again emailed Director Shiu, this time stating that she was "having health problems due to the stress from the continuous litigation and your failure to resolve or even investigate the harassment and EEO retaliation that I have been subjected to by the Agency." DSOF ¶ 31. She continued that she "want[ed] to file a worker's compensation claim and/or disability claim" and needed information as to how to do so. *Id.* In response, Silberman was provided with information as to how to file a worker's compensation claim, how to file a claim for alleged EEO retaliation, how to apply for disability retirement, and how to request a workplace accommodation. *Id.* ¶ 32.

## IV.    June 26, 2012 Investigative Interview

Thomas planned a second investigative interview to follow up on the questions asked in the April interview, by providing Silberman with the emails at issue to refresh her recollection of them, and to ask about the allegations of racial epithets. DSOF ¶ 33. The date for the interview, June 26, 2012 was selected in advance. *Id.*

Early on June 26, 2012, Thomas told Silberman that he would be conducting a second investigatory interview that afternoon. DSOF ¶ 34. In response, Silberman raised her voice and pointed her finger at Thomas, saying that she was "ill," she thought he was harassing her, and as someone who deals with EEO and disability laws, she thought he should have understood that. *Id.*

Thomas testified that Silberman became "hostile and angry" with him, so much so that he was "very afraid," and that she had pointed her fingers at him and threw papers that were on his desk. DSOF ¶ 35. Others in the office heard Silberman yelling at Thomas. *Id*. The three assistant district directors—Gordon, Smith, and Felder—met to discuss Silberman's behavior, at which time she approached them and stated in a raised voice that the interview was retaliation, she had a disability, and the DOL was trying to take her health insurance from her. *Id*. ¶ 36. Silberman also said she wanted to take sick leave; however that request was not granted until 2:45 p.m., after the interview ended. *Id*. ¶ 37. Silberman continued to behave in a way disruptive to the entire office until the interview commenced at 1:00 p.m. *Id*. ¶ 38. Her disruptiveness caused several of her coworkers to leave the office. *Id*.

The interview was conducted in a conference room and had a long table with four chairs on each side and one chair at each head of the table. DSOF ¶ 39. Thomas, Smith, Gordon, and Kiefer were present. *Id*. When Silberman arrived at the conference room, Kiefer directed her to take a seat across the table from him, instead of the seat she wanted to occupy at the head of the table near the door. *Id*. ¶ 40. In doing so, Kiefer stood up from his seat, put one hand on the table and pointed to the chair across from him with his other hand, stating "No, Ms. Silberman. There." *Id*. Silberman complied with this direction. *Id*. Gordon, Thomas, and Kiefer sat on one long side of the table. *Id*. ¶ 41. Silberman sat on the other side with her union representative. *Id*. Smith took the chair at the head of the table that Silberman had wanted to occupy, with approximately three feet between himself and the door. *Id*.

Silberman never asked to leave the conference room. *Id.* ¶ 42. If she had left without approved leave, she would have been marked as absent without leave. *Id.*

The interview entailed asking Silberman about her behavior, showing her the associated documents to facilitate her answers and refresh her recollection, and allowing her to explain why she acted the way she did. DSOF ¶ 43. During the interview, she admitted sending various emails to Director Shiu. *Id.* On three or four occasions when he felt like Silberman was not answering Thomas's question, Kiefer recalls instructing Silberman to answer the question. *Id.* ¶ 44. Silberman described Kiefer's behavior as "threatening" because he was "screaming in a loud voice" and he told Thomas not to accept Silberman's answers. *Id.* She also testified that his face was red and that he leaned forward towards her while speaking. *Id.* During the interview, Silberman stated numerous times that she was "ill," and at least twice mentioned that she "need[ed] an accommodation." *Id.* ¶ 45. After the interview, Gordon emailed Silberman and offered assistance with "workers compensation, leave, accommodations," and other things, but Silberman did not contact Gordon for assistance. *Id.* ¶ 63. As stated above, she took sick leave once the interview was over. *Id.* ¶ 37.

## V.    Administrative Leave

Silberman came to work the following day and reported to the Federal Protective Service (FPS) that Thomas had falsely imprisoned her the day before. DSOF ¶ 46. FPS officers interviewed both Silberman and Thomas and "determined that no crime had been committed and no further investigation [was] needed." *Id.*

14

Also on June 27, Silberman sought to amend her EEO complaint to "include another act of EEO retaliation and harassment [she] was subjected to yesterday." *Id*. ¶ 47. On June 28, Silberman sent an email to Regional Director Anderson informing him that Thomas falsely imprisoned her, and stating that she thought Thomas's actions violated the Americans with Disabilities Act (ADA) and other statutes. *Id*. ¶ 48. Although Thomas was obviously was aware of the police report, he testified that he does not recall learning what Silberman communicated to Anderson. *Id*. ¶ 49.

On June 29, Thomas approached Silberman in the office and said, "Good Morning," to which Silberman responded in a loud tone that she did not want him— her second-level supervisor—to speak to her. DSOF ¶ 50. On this same date, Deputy Director Ortiz met with eight OFCCP Chicago District Office compliance officers and equal opportunity assistants (nearly one-third of the office) regarding Silberman's behavior. *Id*. ¶ 51. Ortiz memorialized his meeting in a memorandum, concluding that Silberman "was creating a hostile work environment which included employees being fearful of their lives, and that immediate action needed to be taken to return the office to a safe and secure environment." *Id*. As director of the office, Thomas, too, observed that Silberman caused constant disruption and distress in the office, and that her conduct had a very negative impact on office morale. *Id*. ¶ 52. Near the end of the day, Thomas placed Silberman on indefinite paid administrative leave pending investigation into her recent conduct. *Id*. ¶ 53. She continued to accrue benefits and leave at this time. *Id*. Smith testified that Silberman was put on leave to ensure the safety of all office employees, because of the extreme nature of her uncooperative and

15

disruptive conduct during immediately preceding days and the concerns raised by her colleagues about the environment. *Id*. ¶ 54.

## VI. Accommodation Request

In this lawsuit, Silberman claims disabilities of anxiety, depression, phobias, hyperthyroidism, thyroid eye disease, and glaucoma. DSOF ¶ 55. Silberman was first diagnosed with hyperthyroidism in late November 2011, and around that time, Silberman experienced hand tremors, bulging eyes, red eyes, weight loss, and hair color changes. DSOF ¶ 57. However, she testified that none of these symptoms interfered with her ability to perform her job as an EOS. *Id*. ¶ 57. Still, she testified that this condition affected her ability to concentrate, focus, and complete her work, and that it caused her fatigue. *Id*. ¶ 58. From the time she was diagnosed with hyperthyroidism to June 6, 2012, Silberman did not request any accommodation and did not discuss any problems with her work with her supervisors. *Id*. ¶ 59. Silberman was next diagnosed with thyroid eye disease and glaucoma on June 1, 2012. *Id*. ¶ 60. The providers did not place any restrictions on Silberman's work activity, and Silberman remained capable of reading documents on a computer screen. *Id*. ¶ 61. These conditions caused bulging and red eyes, but they were not painful and they did not affect her vision. *Id*. Silberman testified that she was "always able to perform the duties" of her position with these conditions, although she had concerns that she could lose her vision or require surgery. *Id*. Silberman did not want to submit any accommodation request until after she had received the results from an MRI scheduled for June 30, 2012. *Id*. ¶ 63. She testified that it would have been

16

"premature" to discuss accommodations on or around June 6, 2012 or even June 26, because the MRI results were needed. *Id.* ¶¶ 63–64.

While she had already been placed on administrative leave, Silberman submitted a written letter to Thomas requesting various accommodations dated July 1, 2012. DSOF ¶ 65. In that letter, she requested the following: that she be allowed to telework, that she be provided a workplace in room 570, that Kiefer was not to have any direct contact with her, that no private meetings with Thomas were to occur unless the Union president was also present, and requesting certain information if she is required to attend an investigative interview. *Id.* Silberman submitted a confirmation of request for reasonable accommodation dated July 12, 2012, adding that she wanted to be able to use sick leave for 30 days until her medical condition was stabilized, and three of her medical providers submitted letters in connection with her request. *Id.* ¶¶ 67–68. None of the letters detailed any workplace limitations Silberman had at that time. *Id.* ¶ 67.

On November 15, 2012, Silberman submitted an accommodation request asking that she be reassigned in case the agency was unable to satisfy her other accommodation requests. DSOF ¶ 72. This was because she believed she "would have been able to better perform the essential functions and duties of an [EOS] under the supervision of a different second-line supervisor." *Id.*

Silberman and Gordon engaged in an interactive process meeting regarding Silberman's July accommodation requests with Silberman on November 1, 2012, which was a date on which Silberman felt that she better understood her own

accommodation needs. DSOF ¶ 69. While Silberman was still on administrative leave, the DOL granted Silberman's accommodation requests with minor modifications in a determination dated November 20, 2012. *Id.* ¶ 70. Silberman testified that she did not have any issues with the granted accommodations. *Id.* The accommodations granted were meant to assist Silberman in performing her work duties, which Silberman was not performing while on administrative leave. *Id.* ¶ 71. Silberman has not identified any derogatory comments that Thomas, Gordon, or Kiefer made concerning any of her alleged disabilities. *Id.* ¶ 73.

### VII. Post-Administrative Leave Events

By letter dated July 16, 2012, Thomas—after conducting research into the issue—reported to the Attorney Registration & Disciplinary Commission (ARDC) of the Supreme Court of Illinois that Silberman had violated Illinois Rules of Professional Conduct (IRPC) 4.2 and 8.4 by repeatedly contacting a represented party and making a false police report alleging false imprisonment. DSOF ¶ 74. Thomas felt that it was his ethical duty and obligation as an attorney to notify the ARDC of Silberman's rule-violating conduct. *Id.* ¶¶ 6, 75.

While on leave, Silberman's attorney requested a third investigative interview, but despite being scheduled by Thomas at least four times, the interview never occurred because Silberman refused to appear for it. DSOF ¶ 78. Thomas then mailed written questions as an alternative to a third interview. *Id.* ¶ 79. Silberman did not read or answer the questions. *Id.*

In November 2012, Silberman was given her FY 2012 performance appraisal by Gordon, wherein she was rated "minimally satisfactory" on account of a "need to improve" rating in the element of communications. DSOF ¶ 80. That rating was based on four management-validated complaints over the past year (and only two such complaints meant that an individual did not meet this element): (1) an incident where she was unable to assist a differently abled African American complainant, who Silberman said was illiterate and uneducated, (2) a coworker complaint that Silberman used racially offensive remarks in the office, (3) complaints that Silberman disrupted the work of the office, and (4) the incident where Silberman pointed her finger at Thomas and threw papers on his desk. *Id*. ¶ 81. As for the first complaint, Silberman has acknowledged that she could not assist the applicant involved, noting that he was not "well educated" and "he didn't really understand things very well." *Id*. ¶ 82. Silberman was given a "meet" rating for the other elements involved in the appraisal. *Id*. ¶ 81. Despite this review, Silberman testified that she did not feel that Gordon treated her differently than her colleagues, and she was not aware of any comments from either Thomas or Gordon tying her FY 2012 rating to any protected activity. *Id*. ¶¶ 84–85. Still, on December 2, 2012, Silberman amended her EEO complaint to include a claim that her performance appraisal was EEO retaliation and disability discrimination. *Id*. ¶ 86.

As time went on, Silberman understood that Thomas was planning to provide her a notice of proposed removal at a February 22, 2013 meeting, so she resigned

effective that date (before receiving any notice) for "health reasons" and "to protect [her] record" and future employment prospects. DSOF ¶¶ 3, 90.

## VIII.  Administrative Complaints and this Litigation

As noted above, Silberman's first formal administrative complaint relevant to this action was filed on May 22, 2012. DSOF ¶ 91. However, as stated above, this original complaint did not include any information pertaining to Silberman's disabilities. *Id.* Silberman amended this complaint numerous times—on June 27, July 31, and December 2, 2012 as discussed above, as well as on September 18, 2012, and January 2, March 5, March 11, and March 17, 2013. *Id.* ¶¶ 77, 88. As relevant here, Silberman acknowledged that she amended her EEO complaint following her placement on administrative leave, Thomas's ARDC complaint, and her FY 2012 performance appraisal, and that these events did not deter her from coming forward and making a claim. *Id.* ¶ 87. Silberman filed a separate, formal EEO complaint alleging failure to accommodate on July 11, 2013. *Id.* ¶ 89.

Silberman subsequently sued the DOL, asserting six claims under the Rehabilitation Act. Am. Compl. In addition to alleging that the DOL failed to accommodate her (Count VI), Silberman alleges that she was subjected to retaliation when she was placed on administrative leave (Count IV), Thomas notified the ARDC about her behavior (Count I), and she was rated as "partially meets" in her 2012 performance evaluation (Count V). Finally, Silberman claims that she was subjected to a retaliatory hostile work environment when Thomas conducted two investigative interviews into her misbehavior, when he attempted to conduct a third interview, and

when Silberman later learned that she would be issued a proposed removal (Count II), and when Kiefer "intimidated" her in the June 26, 2012 investigative interview (Count III).

The DOL's fully briefed motion for summary judgment is before the Court.[7] Mot. Summ. J.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Parker v. Brooks Life Sci.,*

---

[7]Silberman filed several motions for leave to file supplemental authority, two of which the previously assigned Judge and this Court granted, and to which the DOL responded. R. 91-1, Pl. 1st Notice Suppl.; R. 92. Def. Resp. 1st Notice; R. 103, Pl. 2nd Notice Suppl.; 105, Def. Resp. 2nd Notice; R. 93; R. 104. The Court considers the supplemental authority cited therein to the extent it is relevant to the Court's analysis.

*Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (cleaned up). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2).

## Analysis

In the Amended Complaint, Silberman brings six claims against the DOL under the Rehabilitation Act.[8] Am. Compl. Specifically, Silberman alleges that: (1) the DOL failed to accommodate her disabilities (Count VI); (2) she was subjected to retaliation[9] when she was placed on administrative leave (Count IV), Thomas notified

---

[8]As the DOL points out in its motion, Silberman's original complaint alleged violations of Title VII of the Civil Rights Act, but her Amended Complaint abandoned those claims, and therefore they have been waived. Memo. Summ. J. at 12 n.1 (citing, *inter alia Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (amended complaint is operative complaint and governs the analysis)). Silberman does not dispute this in her response. *See* Resp.

[9]In Response, Silberman also appears to argue that the June 26, 2012 interview was conducted in retaliation for her protected activity. Resp. at 14. Typically, a party cannot amend its pleadings in a response to a motion for summary judgment. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023) ("We expect justice will rarely require leave to amend in the context of new claims presented for the first time in opposition to a motion for summary judgment."). That may be true, but for the sake of completeness and finality, and because the theory was at least alluded to in the Amended Complaint, and addressed in the DOL's reply, the Court exercises its discretion to construe Silberman's Response as a constructive motion for leave to amend to add a retaliation claim based on the June 26, 2012 interview. *See id.* 488–89; *see also* Am. Compl. ¶ 48 (Silberman "said the interrogation[ of June 26, 2012 was] harassing and retaliatory); ¶ 56 (Silberman wrote in a letter to Anderson "of what had occurred on June 26. She ended the letter requesting an immediate end to the harassment and retaliation."); Reply at 10–17 (arguing summary judgment is warranted for the DOL on a retaliation claim based on the June 26 interview).

the ARDC about her behavior (Count I), and she was rated as "partially meets" in her 2012 performance evaluation (Count V); and (3) she was subjected to retaliatory hostile work environment when Thomas conducted two investigative interviews into her misbehavior, when he attempted to conduct a third interview, and when Silberman later learned that she would be issued a proposed removal (Count II), and when Kiefer intimidated her in the June 26, 2012 investigative interview (Count III).

The Rehabilitation Act prohibits discrimination against qualified employees with a disability solely because of the disability and requires an agency to offer a reasonable accommodation for such qualified persons. *Yochim v. Carson*, 935 F.3d 586, 590 (7th Cir. 2019). Retaliation by an agency employee against a disabled person for engaging in protected activity is also prohibited. 29 U.S.C. § 791(f); *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). The standards for discrimination under the Rehabilitation Act are the same as under the Americans with Disabilities Act. *See* 29 U.S.C. § 791(f); *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020).

The DOL argues that it is entitled to summary judgment on each of Silberman's claims. The Court starts with Silberman's failure to accommodate claim.

## I. Failure to Accommodate (Count VI)

The Rehabilitation Act requires an employer to make a reasonable accommodation for a qualified individual with a disability so that the person can do his or her job, so long as the accommodation does not impose an undue hardship on the employer. *Yochim*, 935 F.3d at 590. To prevail on a reasonable accommodation claim, a plaintiff must show that: (1) the employee was a qualified individual with a

disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021). The plaintiff must point to evidence sufficient to establish each element of the claim. *See Staunton v. City of Chicago*, 2010 WL 1506016, at *2 (N.D. Ill. Apr. 13, 2010).

The DOL argues that Silberman cannot prove that she was a qualified individual with a disability or that the DOL failed to reasonably accommodate the disability. R. 64, Memo. Summ. J. at 15–18. The Court begins with the second element, as it finds it dispositive. *See Aylward v. Hyatt Corp.*, 2005 WL 1910904, at *20 (N.D. Ill. Aug. 5, 2005) (granting defendant's summary judgment motion on failure to accommodate claim where employer granted the plaintiff's accommodation requests).

According to the DOL, Silberman's failure to accommodate claim fails because, even without addressing whether Silberman's accommodation requests were reasonable, the undisputed record establishes that they were granted, and where an accommodation request is granted, a failure to accommodate claim cannot survive. Memo. Summ. J. at 16–17 (citing *Simpson v. DeJoy*, 2021 WL 6124885, at *2 (7th Cir. Dec. 28, 2021); *Aylward*, 2005 WL 1910904, at *20).

As stated above, on July 1, 2012, Silberman submitted her first accommodation request to Thomas, requesting that she be allowed to telework, that she be provided a workplace in room 570, that Kiefer was not to have any direct contact with her, that no private meetings with Thomas were to occur unless the Union president was also

24

present, and requesting certain information if she is required to attend an investigative interview. DSOF ¶ 65. On July 12, 2012, Silberman submitted a confirmation of request for reasonable accommodation, adding that she wanted to be able to use sick leave for 30 days until her medical condition was stabilized, and three of her medical providers submitted letters in connection with her request. *Id.* ¶¶ 66–67. The DOL granted these requests, with minor modifications, in a determination dated November 20, 2012. *Id.* ¶ 70. Silberman testified that she was satisfied with the accommodations. *Id.* It is undisputed that Silberman was on administrative leave when the DOL granted the accommodations. DSOF ¶ 70. She resigned before she returned to work. *Id.* ¶ 71.

Silberman argues, in four total sentences unsupported by any authority, that the DOL failed to accommodate her because she was only provided with a piece of paper, but did not receive telework instructions, an agreement, or telework training, and the DOL "never allowed [her] to return to work after being placed out on leave." Resp. at 5. The only authority cited by Silberman in support of her failure to accommodate claim appears not in her response, but in a notice of supplemental authority, in which she cites a Seventh Circuit case decided two years before the filing of her response brief. R. 103, Pl. 2nd Notice Suppl. at 3 (citing *McCray v. Wilkie*, 966 F.3d 616, 618 (7th Cir. 2020)). She cites *McCray* for the proposition that the DOL did not provide her with any part of the accommodation. *Id. McCray* is distinguishable.

In *McCray*, the Seventh Circuit reversed the district court's dismissal of a failure to accommodate claim under the Rehabilitation Act, finding that, at the

pleading stage, the plaintiff had sufficiently pled a claim, as a reasonable factfinder may find that an 11-month delay in providing the plaintiff a different van to accommodate his disabilities (that is, so he could drive without pain) was unreasonable. 966 F.3d at 622. As an initial matter, *McCray* was decided on a motion to dismiss, so the complaint only needed to contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On the other hand, here, Silberman must cite to evidence sufficient to establish each element of the claim, *see Staunton*, 2010 WL 1506016, at *2. What's more, the facts of *McCray* are distinguishable, as Silberman was on administrative leave when she requested the accommodations, and the DOL granted her requests while she was on leave. R. 105, Def. Resp. 2nd Notice at 4. Unlike the plaintiff in *McCray*, she was not performing duties that needed an accommodation quickly.

As the DOL points out in reply, Reply at 9, "[a] reasonable accommodation is a modification to the work environment or to the way in which work is performed that allows a qualified individual with a disability to perform the essential functions of her job." *Fuller v. McDonough*, 2022 WL 2291224, at *10 (N.D. Ill. June 24, 2022), *aff'd,* 84 F.4th 686 (7th Cir. 2023) (citing 29 C.F.R. § 1630.2(o)(1)(ii); *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014)). While Silberman was on paid administrative leave, she was not performing her job duties, meaning there was no job or work environment to adjust at the time. The accommodations would have been applied when she returned to work, but, as stated above, Silberman resigned before

26

returning to work. Reply at 9 (citing DSOF ¶¶ 3, 71). Therefore, Silberman's contention that she was not accommodated because she did not receive instructions or training on how to telework does not save her claim.

As to Silberman's argument that she was not allowed to return to work after being placed on leave, she cites to testimony from Anderson and Thomas that she did not return to work before she resigned; however, the testimony does not show that Silberman would never have been allowed to return to work (with accommodations) if she had not resigned. Resp. at 5 (citing Def. Exh. 8, Anderson Dep. at 84:7–21; Def. Exh. 37, Thomas Dep. at 252:2–5[10]). Silberman cannot fault the DOL for her own resignation.

Finally, the Court turns to Silberman's November 15, 2012 accommodation request asking that she be reassigned to a different supervisor if the agency was unable to satisfy her other accommodations requests. DSOF ¶ 72. This accommodation was not granted, but Silberman admitted that she made this request as a backup, if the DOL could not accommodate the other requests. *Id.* Silberman posits that the DOL chose not to implement her other requested accommodations, so it should have engaged in the interactive process to determine if reassignment was possible. Resp. at 6. As discussed above, the DOL satisfied Silberman's other requests, so reassignment was not necessary. Even if it had not, the Court agrees

---

[10]Looking at the context of Thomas's testimony, which was not cited in full by Silberman: he answered "no" to the following question: "Looking at this document dated November 20th, 2012, from the time that this accommodation was granted to the time Ms. Silberman resigned in February 2012, did you ever allow her to come back to work?" Def. Exh. 37, Thomas Dep. at 251:21–252:5).

with the DOL that a request for reassignment to a different supervisor is not reasonable. Memo. Summ. J. at 17 (citing, *inter alia*, *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996)).

Accordingly, the Court finds that Silberman is unable to establish a *prima facie* claim for failure to accommodate.

## II.     Retaliation (Counts I, IV, and V)

The Court next turns to Silberman's retaliation claims. To prevail on a retaliation claim under the Rehabilitation Act, a plaintiff must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action." *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023). Courts analyze retaliation claims under the Rehabilitation Act and the ADA under the same standards. *See A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018).

Silberman claims she experienced retaliation in violation of the Rehabilitation Act when she was placed on administrative leave (Count IV), Thomas notified the ARDC about her behavior (Count I), she was rated as "partially meets" in her 2012 performance evaluation (Count V), and she was required to participate in the June 26, 2012 interview.

The Court starts with causation, as it finds that element dispositive. The DOL contends that under Seventh Circuit law, Silberman must establish that the DOL's retaliatory motive was the *but-for* cause of the adverse actions alleged. Memo. Summ.

J. at 22 (citing *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017))); Reply at 17 (citing, *inter alia*, *Parker*, 39 F.4th at 936). Since the parties completed briefing, the Seventh Circuit issued a decision in a Rehabilitation Act case, finding that a plaintiff "does not need to show but-for causation, just that retaliatory intent played a part in her termination." *Fuller*, 84 F.4th at 691. The Court follows *Fuller* and finds that but-for causation is not necessary.

To determine whether there exists a genuine issue of material fact as to whether a plaintiff's protected activity caused her termination, the Court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *Parker*, 39 F.4th at 936–37 (cleaned up). To show that retaliation played a part in her termination, Silberman can use either direct or circumstantial evidence. *Rowlands*, 901 F.3d at 801–02. An admission that the DOL put Silberman on administrative leave in retaliation for her complaints of disability discrimination would be direct evidence. *Id.* at 802. The Seventh Circuit has acknowledged that such evidence is rare. The more common evidence plaintiffs present is circumstantial, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (cleaned up). Courts must consider direct and circumstantial evidence together, not separately. *Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir. 2016).

One method of establishing a retaliation claim is for a plaintiff to set forth a *prima facie* case of retaliation under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff does so, then the defendant-employer "must then offer a legitimate, nondiscriminatory reason for its adverse action." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001). Then the burden shifts back to the plaintiff to show that the employer's reason was pretextual. *Koty v. DuPage Cnty., Illinois*, 900 F.3d 515, 519 (7th Cir. 2018). "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) (cleaned up). Even when examining a retaliation claim under the burden-shifting framework, ultimately, "the inquiry comes down to one question: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action?" *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022).

Before turning to the parties' arguments about causation, it is worth addressing what constitutes "protected activity." A plaintiff engages in protected activity under the Rehabilitation Act when she asserts her rights under the Act "by either seeking an accommodation or raising a claim of discrimination due to his disability." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015). So, simply mentioning to her employer that she has health issues, or complaining about *other* forms of discrimination (that is, not discrimination based on her disability) is not considered protected activity. *See, e.g.*, *Hirmiz v. Travelodge*

30

*Hotel Corp.*, 2016 WL 5391180, at \*4 (N.D. Ill. Sept. 27, 2016), *aff'd sub nom. Hirmiz v. New Harrison Hotel Corp.*, 865 F.3d 475 (7th Cir. 2017).

Here, the parties dispute the protected activity in which Silberman engaged. Silberman contends her "protected EEO activity started in 2006." Resp. at 2. However, Silberman does not cite to any evidence that her EEO activity or any other complaints related to complaints of *disability* discrimination or were requests for accommodations until June 2012. Indeed, Silberman admits this fact. *See* Pl. Resp. DSOF ¶ 15. For the first time, on June 6, 2012, Silberman emailed Director Shiu informing her that she was having health problems resulting from stress related to her other EEO complaints, and asking for information about how to file for workers compensation and how to apply for disability retirement. *Id.* ¶ 31. In response, the DOL provided information about how to file a workers compensation claim, how to apply for disability retirement, and how to request a workplace accommodation. *Id.* ¶ 32. Importantly, Silberman did not request an accommodation at this time. Indeed, Silberman admitted that she thought it was premature to ask for an accommodation before she had an MRI on June 30, 2012. DSOF ¶ 63.

Her protected activity began on June 28, 2012 when she emailed a letter to Anderson alleging a violation of the ADA, followed by her July 1, 2012 accommodation request, her July 12 request for additional accommodations, her July 2 email about amending her EEO complaint, and her subsequent amendments to her EEO complaint alleging failure to accommodate or disability discrimination on December 2, 2012, January 2, March 5, March 11, and March 17, 2013. DSOF ¶¶ 48, 65–66, 68,

86–88. However, the DOL is correct that Silberman cannot use protected activity to immunize herself from consequences for unacceptable or insubordinate conduct. Memo. Summ. J. at 20–21 (citing, *inter alia Kahn v. U.S. Sec'y of Lab.*, 64 F.3d 271, 279 (7th Cir. 1995), as modified (Sept. 7, 1995) ("[T]he rights afforded to the employee are a shield against employer retaliation, not a sword with which one may threaten or curse supervisors.") (cleaned up); *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007) ("[A]n employee's complaint of harassment does not immunize h[im] from being subsequently disciplined or terminated for workplace behavior.")).

With that in mind, the Court addresses each alleged adverse action in turn to determine whether Silberman has adduced sufficient evidence to create a question of fact as to whether her protected activity caused the adverse actions.

## A. Administrative Leave

The Court starts with Silberman's claim that she was placed on administrative leave on June 29, 2012 as a result of her protected activity.

As an initial matter, the Court agrees with the DOL that Silberman's report to the FPS cannot be considered protected activity because her accusations that Thomas had committed a crime by holding her against her will contain no indication of disability discrimination. Memo. Summ. J. at 23 (citing DSOF ¶ 46; Def. Exh. 49). Silberman does not argue in response that her FPS report constitutes protected activity, and therefore she has waived the argument. *See* Resp. at 15–16; *In re GT Automation Grp., Inc.*, 828 F.3d 602, 605 (7th Cir. 2016) ("An argument not responded to is ordinarily deemed waived.").

32

That leaves Silberman's June 28, 2012 email to Anderson, in which she claimed that Thomas's actions were "EEO retaliation and harassment and violated the [ADA]." Pl. Resp. DSOF ¶ 48. Silberman adduces no evidence, however, that Thomas knew of the email before he placed Silberman on administrative leave. She points to his declaration in which he states that he did not "recall learning that Ms. Silberman complained about me to Regional Director Anderson, let alone the actual substance of any such complaints." *Id.* (quoting Def. Exh. 7, Thomas Decl. ¶ 36). In her response, she writes that she told Thomas on June 29, 2012 that she had reported what occurred on June 26 to Anderson; however, she does not cite to a statement of fact or to an exhibit in support of this proposition, and therefore the Court will not consider it. *See* LR 56.1(g). Without more, Silberman presents only speculation that Thomas knew about her complaint to Anderson, which is insufficient to support causation. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (inferences supported only by speculation or conjecture will not defeat a summary judgment motion); *Lesiv*, 39 F.4th at 916 (a plaintiff does not "meet his burden on causation to survive summary judgment [if] he cannot offer evidence of knowledge on the part of his supervisors").

Even assuming in the alternative, as does the DOL, that Thomas was aware of Silberman's June 28, 2012 complaint to Anderson, the only evidence in support of causation adduced by Silberman is timing, and "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable

issue." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (collecting cases). Silberman is correct, however, that "[t]iming alone may suffice to prove causation, however, where the adverse action follows 'close on the heels of a protected act.'" Resp. at 29 (quoting *Rayford v. La Petite Acad., Inc.*, 2021 WL 2311968, at *5 (N.D. Ill. June 4, 2021) (quoting *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011)); *see also* Pl. 1st Notice Suppl. at 1 (citing *Xiong v. Bd. of Regents of Univ. of Wisconsin Sys.*, 62 F.4th 350, 355 (7th Cir. 2023) ("[W]e have little trouble concluding that a jury could infer causation when merely one day passes between the protected activity and the adverse employment action.")).

True, it is hard to follow any more "close[ly] on the heels" of a protected act than being put on administrative leave one day after sending a letter alleging disability discrimination, *Rayford*, 2021 WL 2311968, at *5, and the Seventh Circuit has found a jury could infer causation based on such timing, *Xiong*, 62 F.4th at 355. But, as the DOL points out, the undisputed evidence shows that Silberman had engaged in insubordinate conduct for months before she raised any issues with her health, and that she "exhibited escalating disruptive workplace behavior in the days immediately preceding the leave decision," such that her coworkers claimed to feel fearful based on her conduct. Memo. Summ. J. at 24 (citing DSOF ¶¶ 20, 23, 34–36, 38, 50–52).

Indeed, the DOL presents evidence that it placed her on administrative leave because of her "recent conduct," which included combative behavior with Thomas, her second-level supervisor, as well as volatile and disruptive behavior in the office that

seriously interfered with the work of her office and immediately preceded the leave decision. Memo. Sum. J. at 27 (citing DSOF ¶¶ 51, 54 (based on accounts of those events from Silberman, Thomas, and the eight OFCCP employees, Silberman was put on administrative leave "so the work environment would be safe for everyone because there was obviously a volatile environment")). Participation in protected activity "doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination." *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 745 (7th Cir. 2010).

In response, Silberman contends that the DOL's reasoning must be pretextual because it offered shifting rationales for placing her on administrative leave. Resp. at 16 (citing *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003). She points to Thomas's declaration, in which he states that he placed Silberman "on paid administrative leave pending investigation of her disruptive workplace conduct (as described in Exhibit 44) and insubordinate emails to Director Shiu." Resp. at 16 (quoting Def. Exh. 7, Thomas Decl. ¶ 37). Exhibit 44, Thomas's statement, dated June 29, 2012, regarding Silberman's conduct on June 26, 27, and 29 and information regarding placing her on administrative leave, mentioned only Silberman's "recent conduct" and did not specifically mention Silberman's insubordinate emails to Director Shiu. *Id.* (citing Def. Exh. 44). However, it is undisputed that Silberman's numerous emails to Director Shiu were also an issue at the time she was put on administrative leave. That is, she admits that she had been instructed more than once not to contact Director Shiu, but that Silberman

nonetheless continued to email Director Shiu, which was the subject of the April 24, 2012 and June 26, 2012 interviews. DSOF ¶ 21–27, 31, 43.

Here, while Silberman's emails to Director Shiu were not specifically cited in Thomas's June 29, 2012 decision to put Silberman on administrative leave, his later citation to those emails—which he had instructed her not to send—does not undermine the validity of the DOL's proffered rationale for placing her on administrative leave. *See Schuster v. Lucent Techs., Inc.,* 327 F.3d 569, 579 (7th Cir. 2003) (no evidence that company's decision to terminate plaintiff was pretextual when it added an additional reason for his termination, which was not inconsistent).

Apart from *Schuster*, which cuts against Silberman as noted above, the other cases cited by Silberman are inapposite, as the plaintiffs in each case provided significantly more evidence of shifting rationales for the adverse employment decisions. For example, in *Zaccagnini*, the Seventh Circuit found there to be a question of fact as to the employer's explanation for not rehiring the plaintiff where, in its opening summary judgment brief, the employer briefing mentioned that it had a "no rehire policy," and for the first time in response, it argued that it did not rehire the plaintiff because it practice of only hiring drivers through the union and the plaintiff was not referred by the union. 338 F.3d at 677–678. Similarly, in *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 932–33 & n.13 (7th Cir. 2001), the defendant provided numerous explanations, some of which were not accurate, for why it did not hire the plaintiff.

The issues raised by Silberman are insufficient to create a question of fact that the legitimate, nondiscriminatory reasons offered by the DOL in support of placing her on administrative leave were "a lie or a sham to cover up discriminatory motives." *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 505 (7th Cir. 2017). Accordingly, the Court agrees with the DOL that Silberman's disruptive conduct "'so overwhelms that no reasonable jury could infer' that her alleged protected activity caused any adverse actions." R. 92, Def. Resp. 2nd Notice (quoting *Xiong*, 64 F.4th at 356).

## B. ARDC Complaint

Silberman also posits that Thomas retaliated against her by submitting a complaint to the ARDC on July 16, 2012, in which he alleged that he believed that Silberman violated Rules 4.2 and 8.4 of the IRPC. Silberman again relies on the "suspicious timing" between her June 28, 2012 letter to Anderson complaining about Thomas and Thomas's July 16, 2012 ARDC complaint. Resp. at 29. As stated above, timing, on its own (which is even more tenuous for this claim, as there is more than a two-week delay between the protected activity and the adverse action), is usually insufficient on its own to create a triable issue. *Stone*, 281 F.3d at 644.

Again, as noted above, the Court agrees with the DOL that Silberman adduces only speculation that Thomas knew about the June 28, 2012 letter to Anderson, which is insufficient to support causation for a retaliation claim. *See supra* Section II.A. But, again putting that aside in the alternative, as does the DOL, the Court also agrees with the DOL that Silberman has failed to rebut its proffered rationale for why

Thomas sent the letter. That is, the undisputed evidence is that Thomas believed it was his ethical duty as an attorney to report that Silberman had engaged in conduct that violated the rules of professional conduct. Memo. Summ. J. at 28 (citing DSOF ¶ 75; IRPC 8.3(a)); *see also Skolnick v. Altheimer & Gray*, 730 N.E.2d 4, 13 (Ill. 2000) ("[T]he duty to report misconduct is absolute.") (citing *In re Himmel*, 533 N.E.2d 790, 794 (Ill. 1988)). Indeed, Silberman admitted that she contacted Shiu after being told that Shiu was a represented party in litigation, and being instructed to contact agency attorneys. *Id.* (citing DSOF ¶ 26).

In response, Silberman contends that Thomas did not have a professional responsibility to report her to the ARDC, as she had no duty to know the elements of false imprisonment, and indeed, that she could have honestly believed that she was falsely imprisoned. Resp. at 29–33. Therefore, reasons Silberman, his explanation as to why he sent the letter is meritless, or, put another way, is pretextual. *Id.* at 29. Additionally, as to the complaint about her continued emails to Director Shiu, Silberman argues that IRPC 8.3(a), cited in the DOL's memorandum, and which provides that "[a] lawyer who knows that another lawyer has committed a violation of Rule 8.4(b) or Rule 8.4(c) shall inform the appropriate professional authority," is inapplicable. IRPC 8.4(b) pertains to criminal conduct, which is inarguably inapplicable, and 8.4(c) states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. From Silberman's perspective, Thomas's complaint that she violated Rule 4.2 by contacting a represented party did not have to be reported to the ARDC under Rule 8.3(a). The

Court agrees, and if that were the only instance of alleged misconduct in the ARDC letter, the Court may agree with Silberman that the DOL's explanation was pretextual.

However, as stated above, the ARDC letter also reported that she engaged in dishonest and deceitful conduct in violation of RPC 8.4(c) when she contacted the FPS and claimed that she had been falsely imprisoned during the June 26 Interrogation. Def. Exh. 64 at 2. That Silberman disagrees with Thomas's analysis regarding her complaint to the FPS about false imprisonment, or that he did not present her side in the ARDC letter, are insufficient to make his stated reason for sending the letter pretextual. "In determining whether an employer's stated reason is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper*, 687 F.3d at 311. Silberman has adduced no evidence that Thomas did not legitimately believe that he had a professional obligation to report what, from his perspective, was the filing of a false police report, to the ARDC.

Silberman cites two cases in support of her pretext argument in her second notice of supplemental authority. Pl. 2nd Notice Suppl. at 1–2 (citing *Salem v. Att'y Registration & Disciplinary Comm'n of Supreme Ct. of Ill.*, 85 F.4th 438 (7th Cir. 2023); *Alley v. Penguin Random House*, 62 F.4th 358 (7th Cir. 2023)). The Court agrees with the DOL that neither case supports Silberman's position.

In *Salem*, an attorney who had been sanctioned by the ARDC and subsequently suspended by the Supreme Court of Illinois based on misconduct, filed suit against

the ARDC under 42 U.S.C. § 1983, seeking monetary sanctions to compensate him for the suspension. 85 F.4th at 441. The Seventh Circuit rejected the attorney's arguments, reasoning in part that a "decision of the Supreme Court of Illinois suspending [the attorney] from the practice of law cannot be collaterally attacked in civil litigation." *Id.* at 443. Silberman contends that, because the ARDC closed Thomas's complaint against her, the Court "must accept the ARDC's decision," and since she "has never been adjudicated by a civil or criminal court or any administrative body to have filed a false police report," nor found to have "engaged in any conduct involving dishonesty, fraud, deceit, misrepresentation or violated any rule of professional conduct, . . . the DOL is not able to provide a legitimate explanation for the ARDC complaint." Pl. 2nd Notice Suppl. at 1–2. As the DOL argues in response, however, here, there is no Illinois Supreme Court order that was issued or that is being attacked. Def. Resp. 2nd Notice at 2. And, while the ARDC dismissed the complaint against Silberman, as stated above, the Court looks at whether Thomas "honestly believed" the reason given for the allegedly adverse action (that is, his obligation to report what he perceived as Silberman's misconduct to the ARDC), not whether the reason was "inaccurate." *Harper*, 687 F.3d at 311. Silberman has not provided any evidence showing that Thomas did not honestly believe that he was required under the IRPC to report Silberman's violations of the IRPC.

The Court agrees with the DOL that *Alley* cuts against Silberman's argument. Def. Resp. 2nd Notice at 2. In *Alley*, the Seventh Circuit found that the employer provided a "perfectly reasonable explanation for the timing of [the plaintiff's]

demotion: [the employer] learned of her failure to comply with her obligation to report sexual harassment allegations and demoted her eight days later, after concluding its investigation." 62 F.4th at 362. As discussed above, the Court finds that the DOL also provided a "perfectly reasonable explanation" for the ARDC letter: Thomas sent the letter several weeks after Silberman made what he believed to be a false police report, which he "honestly believed" he was required to report to the ARDC under IPRC 8.3(a) and 8.3(c). He also had an evidentiary basis to report her violations of IPRC 4.2, and he testified that he felt that it was his ethical duty and obligation as an attorney to notify the ARDC of Silberman's rule-violating conduct.

### C. FY 2012 Rating

Silberman also claims that her FY 2012 rating of "minimally satisfactory" on account of a "need to improve" rating in the element of communications was retaliatory. Gordon completed the performance appraisal in November 2012. DSOF ¶ 80.

According to the DOL, the rating was based four management-validated complaints over the past year (and only two such complaints meant that an individual did not meet this element): (1) an incident where Silberman was unable to assist a differently abled African American complainant, who Silberman said was illiterate and uneducated, (2) a coworker complaint that Silberman used racially offensive remarks in the office, (3) complaints that Silberman disrupted the work of the office, and (4) the incident where Silberman pointed her finger at Thomas and threw papers on his Desk. Memo. Summ. J. at 11 (citing DSOF ¶ 81). The DOL argues that

Silberman has nothing connecting her "minimally satisfactory" rating to any protected activity but timing, which is even more tenuous than the two above alleged actions. *Id.* at 25.

Silberman retorts that because she received a "meets" review rating on May 25, 2012, the November 2012 performance review covers just one month. Resp. at 24. Silberman, however, does not cite to a statement of fact or any evidence of her May 25, 2012 performance review, so the Court will not consider it. LR 56.1(g).

She also argues that Gordon did not discuss any issues before lowering the rating, as she was "required" to do. Resp. at 24 (citing Pl. Exh. 27). Silberman disputes making the racist statement and one other complaint made by a co-worker, but also acknowledges that having two or more complaints over a year warrants a "minimally satisfactory" rating. *Id.* As the DOL points out in reply, by only disputing two of the four complaints, Silberman admits that she met the "needs improvement" rating. Reply at 14.

Moreover, Silberman admitted that Gordon treated her the same as Gordon's other supervisees. Reply at 14 (citing Pl. Resp. DSOF ¶ 84). Silberman speculates that Gordon gave her a "needs improvement" rating based on any of Silberman's protected activity, and has adduced no evidence that Gordon's proffered reason for the rating was pretextual.

### D. June 26, 2012 Interview

Finally, the Court addresses Silberman's new claim raised in her Response that the June 26, 2012 interview was conducted in retaliation for her "protected

activity." As an initial matter, as discussed above, the Court is skeptical that any of Silberman's conduct before the June 28, 2012 letter constituted "protected activity" for purposes of the Rehabilitation Act. Thus, the June 26, 2012 interview could not have been caused by any protected activity. But, assuming that her inquiries beginning on June 6, 2012 about workers compensation and disability retirement constitute protected activity, the Court finds that she still fails on the causation element.

Here, in addition to timing—her June 6, 2012 email to Shiu, and the June 26, 2012 interview nearly three weeks later—Silberman also points to evidence of another individual, Bernadine Davis, who she argues is similarly situated and was treated better in her investigatory interview. *See* Resp. at 12–14. As stated above, evidence that "similarly situated employees outside of the protected group systematically receive[d] better treatment" can support a finding that adverse treatment towards the plaintiff was the result of discriminatory intent. *Rowlands*, 901 F.3d at 801–02. The problem for Silberman, however, is that Davis also had a disability and had made an accommodation request. Memo. Summ. J. at 26 (citing DSOF ¶ 100). The similarly situated inquiry "requires that the plaintiff name a comparator *outside her protected class." Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012). Silberman argues that Davis was outside of her protected class because Thomas and Smith were not aware of any pending legal matters Davis had against the OFCCP at the time of her investigative interview; but, as discussed above, Silberman's "pending legal matters," including previous EEO

43

complaints, were not based on her disability, and therefore are not protected activity for purposes of her Rehabilitation Act claims. Therefore, the Court finds that Silberman's evidence of how Davis was treated during her interview does not support Silberman's argument that the DOL conducted her interview in a way that violated her rights because of any protected activity.

And again, the DOL sets forth evidence of the reasons for scheduling the interview: her continued emails to Director Shiu after being instructed to only contact her through counsel (the fact of the emails, not the content of them) and her alleged use of a racial slur. Reply at 12 (citing DSOF ¶¶ 30, 33). The June 26, 2012 interview was a continuation of the April 24, 2012 interview, because Silberman had answered "I don't recall" to many questions during the April interview. DSOF ¶ 33.

Silberman cites *Johnson v. Chrysler Grp., LLC*, 2014 WL 3509984, at *5 (S.D. Ind. July 15, 2014) in support of her contention that the DOL's rationale was pretextual. Resp. at 8. The Court agrees with the DOL that *Johnson* is distinguishable, however. In *Johnson*, the employer terminated the employee shortly after he disclosed his disease, allegedly because of his practice of leaving after he finished carryover duties, a practice he had maintained without issue for eleven years. 2014 WL 3509984, at *5. Here, Silberman had been ordered not to contact Director Shiu about litigation matters numerous times and was warned that she could be subject to discipline if she continued to do so. Reply at 15 (citing DSOF ¶¶ 17–19). Thomas first interviewed Silberman in April 2012—before she engaged in any protected activity—and continued the interview to June 28, 2012 in order to show

her emails she had said she did not recall during the April interview. DSOF ¶ 33. The Court finds that Silberman has not provided evidence that the DOL's reasons for scheduling the June 28 interview were pretextual, or that they had anything to do with her protected activity.

Because the Court finds that Silberman cannot meet her burden on causation, it need not address the other elements. *See, e.g.*, *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 916 (7th Cir. 2022) (summary judgment in favor of defendant granted where there was no evidence of causation, even where a question of fact as to the materially adverse action existed). Accordingly, the Court grants summary judgment for the DOL on each of Silberman's retaliation claims.

## III.    Hostile Work Environment (Counts II and III)

Last, the Court addresses Silberman's hostile work environment claims, both of which are premised on Thomas and Kiefer's conduct during the June 26, 2012 interview.[11] "To establish an actionable hostile work environment, a plaintiff must demonstrate that: (1) she was subject to unwelcome harassment; (2) the harassment was based on disability . . .; (3) the harassment was sufficiently severe or pervasive,

---

[11]The Amended Complaint also alleges that Thomas created a hostile work environment by: conducting the April 24, 2012 interview, requesting a third interview, and sending written questions to Silberman. Am. Compl. ¶¶ 95–96. The DOL argued in its memorandum that those actions did not create a hostile work environment, Memo. Summ. J. at 31–32, but Silberman did not address those arguments, or even mention those actions, in response, *see* Resp. As such, by failing to respond to the DOL's arguments, Silberman has abandoned any hostile work environment claim she may have had based on any of Thomas's actions apart from the June 26, 2012 interview. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (plaintiff abandoned claim after failing to respond to arguments in defendant's motion for summary judgment); *see also Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 970 (N.D. Ill. 2016*)* (collecting cases holding same).

both subjectively and objectively, so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). The Seventh Circuit applies the Title VII standard to hostile work environment claims brought under the Rehabilitation Act. *Id.*; *see also Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008).

To determine whether harassment is severe or pervasive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (cleaned up). A plaintiff must "show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). "In order to decide whether a plaintiff's showing at the summary judgment stage meets this standard, the court must examine all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (cleaned up). However, "[o]ne instance of conduct that is sufficiently severe may be enough" to sustain a hostile work environment claim. *Id.* (citing *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999)); *see also Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022) (one-time use of certain words, such as the "N-word[,] an

egregious racial epithet" can be enough to sustain a hostile work environment claim based on the totality circumstances).

Silberman claims that Thomas harassed her by scheduling the June 26, 2012 interview and notifying her of it on the same day and then refusing to reschedule the meeting for another day, despite Silberman's request to take sick leave the rest of the day. Resp. at 11. If Silberman had refused to attend, he would have asked her to go home and she would have been marked absent without leave; so too if she had left in the middle of the interview. *Id.*; *see also* DSOF ¶¶ 37, 42

As for Kiefer, according to Silberman, he harassed her during the June 26, 2012 interview, by: not allowing her to sit in a chair nearest to the door and physically blocking her from sitting it; ordering her to sit in a chair facing him; yelling in her face; stating, "we control the interview"; yelling at her to answer questions; telling Thomas not to accept Silberman's answers; and leaning towards her while speaking. Resp. at 11; Pl. Resp. DSOF ¶ 44. Silberman testified that she found his behavior "threatening," and her union representative described Kiefer's conduct as "combative." Resp. at 11; Pl. Resp. DSOF ¶ 44. Thomas ignored Kiefer's conduct, and all DOL employees ignored Silberman's statements that she was ill, which she made at least five times. Resp. at 12. The interview lasted between one-and-a-half-to-two hours. *Id.*; *see also* DSOF ¶¶ 37–38. Silberman took sick leave after it ended. *Id.*; *see also* DSOF ¶ 37. In her Response, Silberman raises a number of other health consequences resulting from the interview, including her ability to take prescribed medications and her request for tranquilizers. Resp. at 12. Silberman does not cite to

47

any statements of fact or evidence in support of these facts, so the Court does not consider them. LR 56.1(g).

The DOL contends that neither Kiefer nor Thomas's conduct during the June 26, 2012 interview created a hostile work environment. As an initial matter, Silberman fails to adduce any evidence that Kiefer or Thomas's actions were taken because of her disability, her accommodation requests, or her complaints of disability discrimination. Memo. Summ. J. at 31–32. Therefore, argues the DOL, none of their conduct can sustain a hostile work environment claim under the Rehabilitation Act. *Id.* (citing *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 561 (7th Cir. 2019) ("Because Smith introduced no evidence that his supervisors swore at him because he was black, the profanity that he describes does not establish a hostile work environment under Title VII.")). Silberman does not respond to this argument, and therefore has waived a response. *In re GT Automation Grp.*, 828 F.3d at 605. No matter, as the Court agrees with the DOL that Silberman has not presented any evidence that either man's conduct was related to Silberman's protected characteristics or activity, and her hostile work environment claims fail on this basis.

The only case cited by Silberman in her notice of supplemental authority, R. 91-1, Pl. 1st Notice Suppl. at 1, *Dunleavy v. Langfelder*, 52 F.4th 349 (7th Cir. 2022), does not change the outcome. Silberman cites *Dunleavy* for the proposition that the employer knew of the plaintiff's protected characteristic, his race. Pl. 1st Notice Suppl. at 1. The Seventh Circuit found that there was evidence that the employer knew of the plaintiff's race based on the personnel files he reviewed, and there was

48

sufficient evidence that the plaintiff was fired because of his race based on evidence of a similarly situated employee who had engaged in similar misconduct who was not fired. *Dunleavy*, 52 F.4th at 355. Here, even assuming that both Kiefer and Thomas knew of Silberman's protected characteristics and activity as of June 26, 2012, she has not presented evidence—in the form of a comparator or otherwise—tying their conduct during the interview to her disabilities or protected activity.

For the sake of completeness, the Court also addresses whether Kiefer and Thomas's conduct in scheduling and conducting the June 26, 2012 interview was objectionable enough to sustain a hostile work environment claim. While Silberman is correct that a single instance *can* support a hostile work environment claim, Resp. at 10 (citing *Jackson*, 474 F.3d at 499), the DOL accurately points out in Reply that the kinds of single incidents that have been found sufficient include physically damaging conduct such as sexual assault, breaking someone's arm, or damaging her wrist to the point that surgery is required, Reply at 18–19 (citing *Smith*, 189 F.3d at 534). There is no evidence that Kiefer or Thomas physically harmed Silberman during the interview. As stated above, the Court will not consider Silberman's unsupported assertions that she experienced adverse health effects as a result of the interview. And, although she voiced that she felt ill during the interview, the undisputed evidence is that she could have left the interview and simply been marked absent without leave. DSOF ¶¶ 37, 42. Nor did Silberman present any evidence that either Kiefer or Thomas called her any sort of egregious slur (or any slur at all) during the meeting, similar to the use of the N-word discussed in *Scaife*, 49 F.4th at 1116.

The Seventh Circuit has held that "being addressed in a loud, unprofessional tone during one meeting does not satisfy the requirement that the offensive conduct be severe and pervasive." *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008) (collecting cases); *see also Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (intimidation, by being stared and yelled at, is not actionable harm); *Scaife*, 49 F.4th at 1118 (manager's threats to a plaintiff's job and encouragement to act illegally were not sufficiently severe to alter working conditions). That is what the evidence shows occurred at the June 26, 2012 interview. No reasonable jury could conclude that Kiefer or Thomas's conduct at the June 26 interview created a hostile working environment in violation of the Rehabilitation Act.

Silberman also claims that Thomas's harassment caused her constructive discharge. Am. Compl. ¶ 102; Resp. at 23–24. A plaintiff can show constructive discharge in two ways: by demonstrating (1) "a discriminatory work environment even more egregious than the high standard for hostile work environment" or (2) "that she was forced to resign because her "working conditions [became] so intolerable that a reasonable person would have felt compelled to resign. Working conditions become intolerable when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the employee resigns." *Scaife*, 49 F.4th at 1119 (cleaned up). The Amended Complaint only claims constructive discharge as part of Silberman's hostile work environment claim,[12] which falls within

---

[12]To the extent Silberman attempts to constructively amend her complaint to add a claim that she was constructively discharged in retaliation for her complaints of disability discrimination, even if the Court were to find such a constructive amendment was proper, *see Schmees*, 77 F.4th at 489, such a claim would fail based on the materials before the Court.

50

the first method of showing a constructive discharge claim. And, as discussed above, Silberman "cannot demonstrate a hostile work environment claim based on [her protected status or activity], so she is unable to prove a constructive discharge claim that involves a higher standard." *Id.*

## Conclusion

For the foregoing reasons, the DOL's motion for summary judgment [63] is granted. The Court enters summary judgment in favor of the DOL and against Silberman on all counts. Civil case terminated.

Dated: September 12, 2025

United States District Judge
Franklin U. Valderrama

---

As stated above, Silberman cannot proceed on a constructive discharge claim under the first theory supporting such a claim, and her response is silent as to the second, so she has waived the argument, *see Lewis v. Mills,* 677 F.3d 324, 332 (7th Cir. 2012) ("Unsupported and underdeveloped arguments are waived.") (cleaned up).